07-1104-cr
United States v. Finnerty

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: June 13, 2008          Decided: July 18, 2008)

Docket No. 07-1104-cr

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

             Appellant,

      - v.-

DAVID FINNERTY,

             Defendant-Appellee.

- - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, Chief Judge, POOLER, Circuit Judge, RESTANI,[*] Judge.

The government appeals from a judgment of acquittal entered in the United States District Court for the Southern District of New York (Chin, J.), setting aside the jury verdict in a securities fraud prosecution against a New York Stock Exchange specialist who engaged in "interpositioning." We affirm.

---

[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

LAUREN GOLDBERG, Assistant United States Attorney, United States Attorney's Office for the Southern District of New York, New York, NY (Michael J. Garcia, United States Attorney, on the brief, Anirudh Bansal and Celeste Koeleveld, Assistant United States Attorneys, of counsel), for Appellant.

FREDERICK P. HAFETZ, Hafetz & Necheles, New York, NY (Tracy Sivitz, on the brief), for Defendant-Appellee.

DENNIS JACOBS, Chief Judge:

In this securities fraud case, the government appeals from a judgment of acquittal entered by the district judge following a jury's guilty verdict. See United States v. Finnerty, 474 F. Supp. 2d 530 (S.D.N.Y. 2007) (Chin, J.). Defendant-Appellee David Finnerty was a specialist at the New York Stock Exchange ("NYSE") who engaged in the practice of "interpositioning"--the arbitrage of the gap between customers' orders to buy and sell stock--to the benefit of his firm's account and (via compensation) himself. The sole issue on appeal is whether the government proved that Finnerty's conduct was deceptive.

Because it did not, the judgment of acquittal is affirmed.

**BACKGROUND**

This case is one of several arising from an investigation into the practices of specialists on the NYSE trading floor. The NYSE operates as an auction market with specialists fielding competing bids and offers for stock in the 2,800 listed companies. We recently described the role of the specialist firms as follows:

> Each security listed for trading on the NYSE is assigned to a particular [specialist] Firm. To execute purchases and sales of a particular security, buyers and sellers must present their bids to buy and offers to sell to the specific Specialist Firm assigned to that security. The primary method of trading on the Exchange occurs through the NYSE's Super Designated Order Turnaround System, which transmits orders to buy and sell to the Specialist Firm electronically. The orders appear on a special electronic workstation often referred to as the "display book." Each Specialist Firm has a computerized "display book" at its trading post that permits the Firm to execute orders for the market.

In re NYSE Specialists Sec. Litig., 503 F.3d 89, 92 (2d Cir. 2007). In addition to executing trades for NYSE customers, specialists trade for the "proprietary" or "principal" account of their own firm.

In 2002, the NYSE opened an investigation into improper trading by specialists. The investigation focused on two practices: "interpositioning" and "trading ahead." A specialist engages in interpositioning when he "prevent[s]

3

the normal agency trade between matching public orders and instead interpose[s]" himself "between the matching orders in order to generate profits" for the principal account--in other words, when the specialist acts as an arbitrager by taking a profit on the spread between the bid price and the ask price of customers' orders. <u>Id.</u> at 93. A specialist trades ahead when he trades for his own "account before undertaking trades for public investors." <u>Id.</u> These practices implicate two NYSE rules.

NYSE Rule 104 allows for a proprietary trade when it is "reasonably necessary to permit [a] specialist to maintain a fair and orderly market," and otherwise prohibits "such dealings." NYSE Rule 92(a) prohibits a proprietary trade when the specialist "has knowledge of any particular unexecuted customer's order to buy (sell) such security which could be executed at the same price."

<u>The Indictment</u>

In 2006, Finnerty was charged with three counts of securities fraud. The superseding indictment alleged that while he was employed by Fleet Specialists, Inc. between 1999 and 2003, Finnerty "caused approximately 26,300 instances of interpositioning, resulting in illegal profits

to his dealer account of approximately $4,500,000, and approximately 15,000 instances of trading ahead, resulting in approximately $5,000,000 in customer harm."  The indictment charged that Finnerty thus engaged in a fraudulent and deceptive course of conduct, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. Count One charged Finnerty with carrying out this fraud while he was the specialist responsible for trading in the stock of General Electric, from September 2000 through early 2003; Count Two, while specialist for Applera Corp.-Celera Genomics Group, from November 1999 through February 2002; and Count Three, while specialist for PE Biosystems, from November 1999 through September 2000.

Pretrial Rulings

Finnerty moved to dismiss the indictment on the ground that interpositioning is neither deceptive nor manipulative and therefore does not constitute securities fraud.

In relevant part, the Securities Exchange Act of 1934 makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> . . .

5

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j ("§ 10(b)"). Rule 10b-5, promulgated thereunder, makes it unlawful

> for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1995).

The district court granted Finnerty's motion in part, but let stand the allegations based on subsections (a) and (c) of Rule 10b-5. The court reasoned that the NYSE rules

obligate specialists "to place the interests of their public customers above their own"; that Finnerty "made a profit for [himself], and subordinated the interests of the trading public below [his] own"; and that this practice "deceive[d] the trading public, as investors believed that [specialists] were working to match orders, first and foremost, and that [specialists] traded for their own proprietary accounts only to maintain a fair and orderly market." United States v. Finnerty, 2006 WL 2802042, at *4 (S.D.N.Y. Oct. 2, 2006).

The district court ruled that the indictment failed to state a violation of subsection (b) of Rule 10b-5 because it did not identify any statements that were misleading or were made misleading by Finnerty's omission. Id. at *6. The government argued that no such showing was required under "a line of Second Circuit cases that allows for omission liability based on implied misrepresentations" where a securities dealer charges "excessive markups when selling securities." Id. Rejecting that theory, the court reasoned that unlike securities dealers, "specialists do not actively solicit customers," nor do they "'hang[] out [their] professional shingle.'" Id. (quoting Grandon v. Merrill Lynch & Co., 147 F.3d 184, 192 (2d Cir. 1998)) (alteration in original). Because of the dealers' direct relationship with their customers, the court concluded that "the

7

situations are quite distinct," and that the excessive markup cases were inapposite. Id.

Proof at Trial

At trial, the government narrowed its case. It did not undertake to prove trading ahead; it focused exclusively on interpositioning. It did not try to prove that Finnerty owed a fiduciary duty to public customers. And, in accordance with the pretrial rulings, it did not try to prove a violation of subsection (b).

The government called three former NYSE clerks, who testified that Finnerty directed them to execute interpositioning trades for the principal account ahead of (and to the detriment of) existing public orders. One of the clerks, Philip Finale, testified that just before he was scheduled to testify before the NYSE investigation, Finnerty pulled him aside and whispered: "don't say anything to incriminate [me], because it's going to incriminate [you] also."

The government displayed graphics showing the sequence of keystrokes that compose an interpositioning trade. An NYSE managing director testified about the computer codes used to generate "exception reports," which identify

instances of interpositioning and trading ahead.[2]  Several summary charts of that data showed 26,283 instances of interpositioning trades under Finnerty's watch.  In 95% of those instances, Fleet's principal account profited-- yielding a total of $4.5 million.

Joseph DiPrisco, who served as Fleet's CFO during the relevant period, testified that individual "profitability" was one factor that determined a specialist's bonus.  Fleet generally paid a specialist 15 to 20% of his profits.

Finally, the government introduced into evidence Finnerty's testimony before the NYSE, in which Finnerty admitted that he and his clerks could trade for the principal account only when necessary to maintain a fair and orderly market, and only when the public customers subsequently received the same or a better price than the principal account received.

Finnerty called Dr. Patrick Conroy, who testified that Finnerty's 26,283 alleged acts of interpositioning represented only .94% of the total trades executed by Finnerty during the relevant time period.

---

[2] The managing director testified to the following definition of an interpositioning trade:  "If two orders, a buy order and a sell order[,] are present at the same time, and the specialist instead of executing them against each other trades separately with each of them, that would be an interpositioning exception."

The jury rendered a guilty verdict on all three counts.

## Post-trial Rulings

The district court granted Finnerty's post-trial motion for a judgment of acquittal on the ground that the government failed to prove that "interpositioning constituted a deceptive act within the meaning of the federal securities laws because it did not provide proof of customer expectations." United States v. Finnerty, 474 F. Supp. 2d 530, 542 (S.D.N.Y. 2007).[3] The district court considered that, in a securities fraud prosecution, the government generally must present "proof of what customers 'think they are getting'; otherwise, a juror has no way of concluding whether customers were deceived by a defendant's conduct." Id. at 539. Without holding that "evidence of customer expectations is an element of the crime that the Government must establish for a conviction under 10b-5," the district court concluded that the very definition of "deceptive" calls for some showing of "what the investing public expected." Id.

The government appeals.

---

[3] In the alternative, the district court ruled that a new trial was warranted based on several evidentiary issues. Because we affirm the judgment of acquittal, we do not review the alternative grant of a new trial.

**DISCUSSION**

"We review the grant or denial of a judgment of acquittal de novo, and we apply the same standards governing the sufficiency of the evidence as are applied by a district court." United States v. Temple, 447 F.3d 130, 136 (2d Cir. 2006). Thus, we will affirm the district court's judgment of acquittal only if "after viewing the evidence in the light most favorable to the prosecution," no rational factfinder "could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

**I**

Section 10(b) of the 1934 Act prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. "The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 473 (1977). The government has abandoned on appeal any claim of market manipulation. So the question is, what did Finnerty say or do that was deceptive?

The government admits that Finnerty made no misstatement. The government told the jury that the "real

11

issue" in the case was "whether David Finnerty directed" the interpositioning trades and whether he did it "intentionally and with the intent to defraud." This was, in essence, a theory of non-verbal deceptive conduct.

"Conduct itself can be deceptive," and so liability under § 10(b) or Rule 10b-5 does not require "a specific oral or written statement." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 769 (2008). Broad as the concept of "deception" may be, it irreducibly entails some act that gives the victim a false impression. "Theft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty." In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig., 2007 WL 2694469, at *8 (S.D.N.Y. Sept. 13, 2007) (Lynch, J.) (internal citation omitted).

The government has identified no way in which Finnerty communicated anything to his customers, let alone anything false. Rather, viewing the evidence in the light most favorable to the government, the government undertook to prove no more than garden variety conversion. As the government put it during summation, "David Finnerty stole from his public customers tens of times a day, sometimes over a hundred times in one day . . ." The government later

analogized Finnerty's conduct to a bank teller who

> takes in hundreds of deposits a day and he gives out hundreds of withdrawals, and just once, once every day takes he takes one of those deposits, instead of putting it in the till, he puts it in his pocket. He committed a crime probably less than 1 percent of the time in that example, but does that make it right to steal? Of course it doesn't.

Like a thieving bank teller, the government argued, Finnerty had the motive and the means to profit from interpositioning.[4] But there is no evidence that Finnerty conveyed an impression that was misleading, whether or not it could have a bearing on a victim's investment decision in connection with a security. We need not decide whether some form of communication by the defendant is always required to prove deception (although that is the template of virtually every case). To impose securities fraud liability here, absent proof that Finnerty conveyed a misleading impression to customers, would pose "a risk that the federal power would be used to invite litigation beyond the immediate sphere of securities litigation and in areas already governed by functioning and effective state-law guarantees." Stoneridge, 128 S. Ct. at 771.

---

[4] The government presented this analogy to rebut Dr. Conroy's testimony that Finnerty's interpositioning trades represented less than one percent of his total trades.

**II**

On appeal, the government presses a number of arguments in support of its prosecution theory.  We are unpersuaded.

The evidence shows (in the words of the government's brief) that "Finnerty, while holding himself out as a specialist obligated to follow NYSE rules and refrain from interpositioning, interpositioned on a massive scale under the guise of maintaining a fair and orderly market."  Accordingly, the government argues, a reasonable jury could find that at least some customers were aware of the NYSE rules, would have expected Finnerty to comply with the rules, and were therefore deceived when Finnerty violated them.  The government relies on the following chain of premises and inferences: (1) brokerage houses are "members" of the NYSE; (2) as members, brokerage houses know about (and are subject to) the NYSE rules against interpositioning; (3) brokerage houses were customers of Finnerty; so (4) Finnerty's violation of the NYSE rules deceived the brokerage houses.  In essence, the government seeks to impose criminal liability based on a background assumption of compliance with NYSE rules.

The government did not make this argument at trial.  Moreover, we rejected a similar argument (made by civil claimants) in a statement case decided last term, Lattanzio

v. Deloitte & Touche LLP, 476 F.3d 147 (2d Cir. 2007). There, shareholders sued the accounting firm Deloitte & Touche based on allegedly false statements in corporate quarterly statements that were neither audited by the firm nor accompanied by its audit opinion. Id. at 152-53. A federal regulation obligated Deloitte, as the issuer's outside accountant, to review interim quarterly statements before expressing an audit opinion on a subsequent filing. Id. at 155. The claim was that "an investor (understanding Deloitte's regulatory obligation) would construe Deloitte's silence as its imprimatur" on the quarterly statements in question. Id. In other words, the shareholders alleged that Deloitte's "mandated review of [the issuer's] quarterly statements associated Deloitte with those statements to such a degree that they became Deloitte's statements, or that the review created a regulatory duty to correct, the breach of which qualifie[d] as a statement under § 10(b)." Id.

This argument failed because in a statement case like Lattanzio, "a party can incur liability [under § 10(b)] only if a misstatement is attributed to it at the time of dissemination." Id. It may be that "a requirement that an issuer's accountant review interim financial statements supports an understanding among the investing public that such reviews are in fact conducted." Id. But that was not

15

enough to ground § 10(b) liability in Lattanzio:

> Public understanding that an accountant is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the accountant. Unless the public's understanding is based on the accountant's articulated statement, the source for that understanding-- whether it be a regulation, an accounting practice, or something else--does not matter.

Id. (internal citation omitted).

The government's argument fails for much the same reason. Some customers may have understood that the NYSE rules prohibit specialists from interpositioning, and that the rules amount to an assurance (by somebody) that interpositioning will not occur. As a consequence, some customers may have expected that Finnerty would not engage in the practice. But unless their understanding was based on a statement or conduct by Finnerty, he did not commit a primary violation of § 10(b)--the only offense with which he was charged. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994) (holding that in the civil context, § 10(b) "does not itself reach those who aid and abet a § 10(b) violation"); Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (explaining that under Central Bank, a defendant "cannot incur primary liability" for a statement neither made by him nor "attributed to [him] at the time of its dissemination");

*Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) ("'Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).'" (quoting *In re MTC Elec. Techs. Shareholders Litig.*, 898 F. Supp. 974, 987 (E.D.N.Y. 1995)).

Taking a slightly different tack, the government argues that Finnerty's scheme was "self-evidently deceptive" because he had "two critical advantages" over his customers: he could see all pending orders to buy and sell a particular stock, and he determined the price ultimately paid.

It may be that Finnerty unfairly profited from superior information. But "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella v. United States*, 445 U.S. 222, 232 (1980). And characterizing Finnerty's conduct as "self-evidently deceptive" is conclusory; there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct. "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." Id. at 234-35.

The government points to evidence showing Finnerty's consciousness of guilt: (1) Finnerty testified before the NYSE that he traded ahead of customers only when the public

17

received the same or a better price than his principal account did (testimony that was countered by the government's demonstrative chart, which showed that the customer was disadvantaged 95% of the time); (2) clerk Philip Finale testified that Finnerty pressured him to lie about being instructed to execute interpositioning trades; and (3) shortly after Finnerty learned about the NYSE investigation, his rate of interpositioning declined almost to zero.

Viewed in the light most favorable to the government, United States v. Iodice, 525 F.3d 179, 182 (2d Cir. 2008), this evidence shows that Finnerty knew he had violated an NYSE rule, and tried to cover it up. But violation of an NYSE rule does not establish securities fraud in the civil context, Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971), let alone in a criminal prosecution. Finnerty may have known that interpositioning was wrong within the context of his employment, and that it put him at risk professionally; but an awareness of peril, a guilty conscience or an impulse to cover one's tracks does not bespeak criminally fraudulent conduct within the context of the securities laws.

Finally, the government cites Basic Inc. v. Levinson, 485 U.S. 224 (1988), for the idea that (in the government's

18

words) interpositioning violates "common sense notions of fair play and honest dealing in the securities market."

Basic Inc. says that under the "fraud-on-the-market" doctrine, "the reliance of individual plaintiffs on the integrity of the market price may be presumed" when "materially misleading statements have been disseminated into an impersonal, well-developed market for securities." Id. at 247. However, the Basic Inc. presumption of reliance arises where a civil plaintiff can point to "public, material misrepresentations" that impugned the integrity of a stock's market price. Id. at 248. Here, the government has attributed to Finnerty nothing that deceived the public or affected the price of any stock: no material misrepresentation, no omission, no breach of a duty to disclose, and no creation of a false appearance of fact by any means.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of acquittal.