10-0031-ag
VanCook v. SEC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————

August Term, 2010

(Argued: May 26, 2011     Decided: August 8, 2011)

Docket No. 10-0031-ag

—————————

JOHN JOSEPH VANCOOK,

*Petitioner*,

— v. —

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

—————————

B e f o r e:

POOLER, SACK, and LYNCH, *Circuit Judges*.

—————————

Petitioner John Joseph VanCook seeks review of an order of the Securities and

Exchange Commission finding that he willfully violated the antifraud and recordkeeping

provisions of the Securities Exchange Act of 1934 by orchestrating a scheme that allowed

favored customers to engage in late trading of mutual funds, and by aiding and abetting

and causing his firm to keep inaccurate books and records.  In relevant part, the

Commission barred VanCook from working in the securities industry, ordered him to

disgorge his unjust enrichment (plus interest), and imposed a civil penalty of $100,000.

VanCook contends, inter alia, (1) that his submission of late trades did not constitute deceptive conduct; (2) that he could not have aided, abetted, or caused his firm's recordkeeping violations, as he was not aware of the illegality or wrongfulness of the firm's recordkeeping practices; and (3) that the sanctions imposed by the SEC were "excessive, draconian, and disproportionate." Because we conclude that VanCook willfully violated the Exchange Act's antifraud and recordkeeping provisions and that the penalties imposed by the Commission were not unreasonable, we DENY VanCook's petition and AFFIRM the Commission's order.

---

MICHAEL J. SULLIVAN, Coughlin Duffy LLP, Morristown, NJ (Mark K. Silver, Coughlin Duffy LLP, Morristown, NJ; Lewis D. Lowenfels, Tolins & Lowenfels, New York, NY, *on the brief*), *for Petitioner*.

SUSAN S. MCDONALD, Senior Litigation Counsel (David M. Becker, General Counsel; Mark D. Cahn, Deputy General Counsel; Jacob H. Stillman, Solicitor, *on the brief*), Securities and Exchange Commission, Washington, DC, *for Respondent*.

---

GERARD E. LYNCH, *Circuit Judge*:

Petitioner John Joseph VanCook, a former stockbroker, seeks review of an order of the Securities and Exchange Commission ("SEC" or "Commission"), which found that he willfully violated the antifraud provisions of the Securities Exchange Act of 1934 ("Exchange Act"), see 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, by orchestrating a scheme that allowed certain customers to engage in late trading of mutual funds, and that

2

he aided and abetted and caused the failure of his firm to keep accurate books and records, in violation of the Exchange Act's recordkeeping requirements, see 15 U.S.C. § 78q(a)(1), 17 C.F.R. 240.17a-3(a)(6).  The SEC barred VanCook from working in the securities industry, issued a cease-and-desist order against him, ordered him to disgorge his unjust enrichment of $533,234.01 plus interest, and imposed a civil penalty of $100,000.

VanCook petitions this Court to vacate the SEC's order.  He argues that, although he helped select customers engage in late trading, he did not violate the Exchange Act's antifraud provisions, because he never made misrepresentations to any victims and because late trading is not in itself fraudulent or deceptive conduct.  He further argues that he could not have aided and abetted his employer's recordkeeping violations because he was never aware of the illegality or wrongfulness of his employer's recordkeeping practices, and because compliance was not his job.  Finally, VanCook argues that the SEC's disgorgement and penalty order was unfair and disproportionate.  Because we conclude that VanCook's conduct clearly violated the Exchange Act's antifraud and recordkeeping provisions, and because the penalties imposed by the SEC were not unreasonable, we deny VanCook's petition and affirm the SEC's order.

## BACKGROUND

### I. Facts

The following facts are derived from the findings of the Administrative Law Judge ("ALJ") and the SEC, which are supported by substantial evidence and which we therefore must accept for purposes of this review.  See 15 U.S.C. § 80b-13(a); Valicenti Advisory

Servs., Inc. v. SEC, 198 F.3d 62, 64-65 (2d Cir. 1999).  Where VanCook's testimony,

which the ALJ reasonably found lacking in credibility, differs from that of the witnesses

found believable, the divergence is indicated in footnotes.

VanCook has worked in the securities industry since 1995, and since 2000 has

provided brokerage services to hedge funds that trade mutual funds.  In 2001, he joined

Louisiana-based Pritchard Capital Partners, LLC ("Pritchard Capital" or "the firm") in

order to launch and manage the firm's New York office and to attract new, mutual-fund-

trading hedge-fund customers to the firm.  When the New York office opened in March

2001, Pritchard Capital also hired Elizabeth McMahon to assist VanCook in taking and

executing customers' orders.  At that time, VanCook and McMahon were the office's only

employees; McMahon reported to VanCook, and they worked closely together.  VanCook

eventually purchased a 20 percent interest in the firm, becoming a co-owner with Thomas

Pritchard.

Pritchard Capital was an introducing broker – that is, "a firm that has the initial

contact with the public customer" but does not itself "handle[] the mechanics of order

entry, confirmation, clearance of trades, calculation of margin, [or] similar activities."

Katz v. Fin. Clearing & Servs. Corp., 794 F. Supp. 88, 90 (S.D.N.Y. 1992).  For the latter

functions, Pritchard Capital contracted with a clearing broker.  When VanCook joined the

firm, its clearing broker was Bear Stearns.  Bear Stearns required the firm to fax its orders

for mutual-fund trades by 4:00 p.m. every trading day in order for fund shares to be

4

credited with that day's net asset value ("NAV").[1] NAVs change daily depending on market events. Late trading enables the trader to profit from market events, such as earning announcements, that occur after 4:00 p.m. and consequently are not reflected in that day's NAV. See Amendments to Rules Governing Pricing of Mut. Fund Shares, Investment Company Act Release No. 26,288, 81 SEC Docket 2553, 2003 WL 22926831, at *2 (Dec. 11, 2003) ("A late trader can exploit events occurring after 4:00 p.m., such as earnings announcements, by buying on good news (and thus obtaining fund shares too cheaply) or selling on bad news (and thus selling at a higher price than the shares are worth)."). That is, the late trader who enters orders after 4:00 p.m., but nevertheless manages to secure that day's NAV, is able to buy, exchange, or redeem his fund shares at a NAV that was calculated before the release of any after-market information. This practice of late trading violates the forward pricing rule of SEC Rule 22c-1. See 17 C.F.R. 270.22c-1.

Mutual funds generally are required to calculate their NAVs daily by 4:00 p.m. Eastern Standard Time, when the closing bell rings on the major U.S. stock exchanges. See 17 C.F.R. 270.22c-1(b)(1); SEC v. Pentagon Capital Mgmt. PLC, 612 F. Supp. 2d

---

[1] A fund's NAV, calculated according to "a statutorily defined formula," reflects the current market value of the fund's total assets minus its total liabilities. In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig., No. 08 Civ. 8235, 2011 WL 1206070, at *5 (S.D.N.Y. Mar. 31, 2011); see also 15 U.S.C. § 80a-2(a)(41); 17 C.F.R. 270.2a-4. NAV has long been considered "the fundamental valuation criterion of registered investment companies." Harriman v. E. I. du Pont De Nemours & Co., 411 F. Supp. 133, 160 (D. Del. 1975).

241, 247 (S.D.N.Y. 2009). Most mutual funds disclose their NAV calculation times in their prospectuses. The mutual funds traded by Pritchard Capital disclosed in their prospectuses that they calculated their NAVs "at" or "as of" the close of regular trading on the New York Stock Exchange ("NYSE"), which is 4:00 p.m. According to McMahon's testimony, Bear Stearns's 4:00 p.m. deadline for receiving orders was a "hard and fast rule."

Late in 2001, VanCook convinced Pritchard Capital to change its clearing broker to Banc of America Securities ("BOA"), which did not have a 4:00 p.m. deadline. Instead, BOA used a computer system, the Mutual Fund Routing System ("MFRS"), that allowed its customers, including Pritchard Capital, to enter orders up to an hour and a half after the NYSE closing bell – that is, up to 5:30 p.m. – while still receiving that day's NAV. The MFRS's instruction manual, a copy of which BOA provided to Pritchard Capital, specified that

> [a]ll orders should be received and time stamped by the close
> of the NYSE 4 PM EST. The MFRS system allows orders
> that have been entered prior to 4 PM EST to be review[ed]
> until 5:15 PM EST.[2]

This feature of the MFRS was designed to allow brokers to "review" timely orders and make corrections after 4:00 – not to enter new orders after 4:00 p.m.

Nevertheless, VanCook soon began exploiting this MFRS loophole on behalf of

---

[2] The parties stipulated in proceedings before the Commission that, despite this statement in the MFRS instruction manual, the actual cutoff time for submitting trades was 5:30 p.m.

three of the firm's hedge-fund customers: Simpson Capital Management ("Simpson"),

Goodwin Trading Corporation ("Goodwin"), and Millennium Capital Management

("Millennium"). In accordance with VanCook's instructions, these three customers would

e-mail or fax VanCook daily lists of proposed orders, or "possible trade sheets," by 4:00

p.m. VanCook or McMahon would immediately timestamp these tentative instructions, but

would wait to submit any orders to BOA until after they had received final instructions as

to which trades the customers wanted to be executed. This procedure enabled the three

favored customers to decide, after the funds' NAVs were calculated at the close of market,

whether to go ahead with the "possible" trades, depending on whether the trades turned

out to be favorable. VanCook would not record the time that a late-trading customer

submitted its final instructions; instead, he would enter the order into MFRS and print a

screenshot of his computer monitor, which reflected the time the order had been entered

into MFRS but not the time that Pritchard Capital had received that customer's final

instruction. Thus, regardless of whether the firm received final order instructions prior to

4:00 p.m. or afterward, the order appeared to have been received by 4:00.

VanCook has stipulated that he regularly allowed Simpson and Goodwin to finalize

trades after 4:00 p.m., that he and McMahon "took some of those calls, took the final

trading orders," and that "one or the other of them or [another Pritchard Capital employee]

would enter them into" MFRS after 4:00 p.m. in order to secure that trading day's NAV.

Between November 2001 and July 2003, VanCook – or Pritchard Capital employees

acting at his behest – executed nearly five thousand late-trading orders for these clients:

7

3,085 for Simpson, 1,828 for Goodwin, and 23 for Millennium.

VanCook's exploitation of the MFRS loophole yielded significant profits for himself, his firm, and these three late-trading clients. His compensation increased dramatically each year; he was paid $180,000 in 2001, $600,000 in 2002, and $800,000 in 2003. And although not all of his pay was connected to late trading, VanCook admits that the Simpson orders, in particular, "accounted for a substantial portion of [his] commissions." In addition, VanCook's late-trading scheme attracted business and convinced existing customers to stay with the firm. Goodwin's chief, for example, testified that VanCook's late-trading scheme was one reason he selected Pritchard Capital as his company's introducing broker, and that Goodwin finalized "probably over ninety percent" of its proposed trade sheets after 4:00 p.m.

Millennium, by contrast, did not originally hire Pritchard Capital for the purpose of engaging in late trading. At first, Millennium always submitted its finalized proposed sheets to VanCook by 3:30 p.m. in accordance with general industry practice. Eventually, however, Millennium grew dissatisfied with the performance of its Pritchard Capital accounts. One of Millennium's portfolio managers, Kovan Pillai, testified that when he told VanCook of Millennium's intention to close its accounts and switch to a new introducing broker, VanCook informed Pillai of "this other business that he was doing with some other customers that was extremely profitable."

Pillai testified that VanCook told him "that you submit the orders as you always do but before 5 o'clock or 5:05 at the latest, if you have a change of heart, if you see

8

something happening in the business world that would change your opinion, then you were able to bust that trade." Similarly, Pillai's assistant, Scott Murray, testified that VanCook had told him of a method for "allow[ing] trades to be canceled if they were no longer desirable based on information that came out between 4:00 o'clock and however late the trades could be canceled." According to Pillai, VanCook assured him and Murray that "we would get the price that we normally would get from placing the order before 4 o'clock."[3]

Millennium chose to remain with Pritchard Capital because of the late-trading scheme that VanCook described to Pillai and Murray, in order "to test the idea to see if it really worked." Under VanCook's scheme, according to Pillai, Millennium "submit[ted] scenarios in the middle of the day as [they] had always done and then sometime around 5 o'clock [they] would make a decision whether [they] wanted to take the trade or not" and would call Pritchard Capital with final trading instructions.

Over time, VanCook was confronted with numerous warnings that his late-trading scheme was improper. In January 2003, approximately one month after Millennium had begun using VanCook's late-trading procedure, Pillai became concerned about its legality and spoke with Millennium's attorney, Fred Stone. Stone told Pillai that the procedure might be illegal and advised Pillai to stop engaging in late trading. Pillai told VanCook

---

[3] VanCook testified that he could not remember "all the specifics or any of the specifics" of this conversation. However, he also testified that he did not "deny [that the conversation with Pillai and Murray] happened."

9

about his conversation with Stone. According to Pillai's testimony, VanCook assured

Pillai that the procedure was not "legally questionable," and that Stone was "being overly

cautious" and was "wrong about this." VanCook took Pillai and Murray to lunch and,

according to Pillai's testimony, again assured them that Stone was wrong and that

VanCook's late-trading system was legal.[4] Later that month, Millennium ceased late

trading through Pritchard Capital.

Four months later, in May 2003, another Pritchard Capital hedge-fund customer

told VanCook that it wanted legal advice regarding SEC Rule 22c-1, which provides that

> [n]o registered investment company issuing any redeemable
> security, no person designated in such issuer's prospectus as
> authorized to consummate transactions in any such security,
> and no principal underwriter of, or dealer in, any such security
> shall sell, redeem, or repurchase any such security except at a
> price based on the current net asset value of such security
> which is next computed after receipt of a tender of such
> security for redemption or of an order to purchase or sell such
> security.

17 C.F.R. § 270.22c-1(a). Specifically, the customer "wanted to know . . . the [latest] time

that they [could] enter orders" each day in order to receive that day's NAV. At

VanCook's request, Pritchard, the majority owner and head of Pritchard Capital, convened

a conference call with the customer to discuss the subject. On the call were VanCook,

Pritchard, the hedge-fund customer, an acquaintance of that customer (another hedge-fund

---

[4] VanCook claims not to recall these conversations, and testified that he did not "think [that he] would ever give any lawyer or compliance officer advice on the laws or rules."

operator), and Pritchard Capital's attorney, Jay Seale. The conclusion reached during the

call was that, although Rule 22c-1 applied to mutual funds ("registered investment

compan[ies]") rather than salespersons, salespersons could nevertheless be held liable for

"aiding and abetting a dealer" for such conduct. Pritchard testified that after the call, Seale

told him and VanCook to "stick to 4:00" for all orders.[5] Nevertheless, even after receiving

this instruction, VanCook continued to execute late trades for Goodwin and Simpson.

In July 2003, Pritchard learned that the New York Attorney General had begun an

investigation into mutual fund trading practices. He testified that he subsequently began

asking VanCook "daily" whether VanCook was "letting people put trades in after 4:00,"

and that VanCook repeatedly told him that "he didn't accept trades after [4:00]" and "had

never done that at [the] firm."[6]

## II. Prior Proceedings

### A. Initial Decision of the Administrative Law Judge

The SEC initiated proceedings against VanCook by issuing an Order Instituting

Administrative and Cease-and-Desist Proceedings. VanCook filed a timely response, and

---

[5] VanCook, again, testified that he could not remember the details of this conversation, although he admitted that the point of the conference call "[p]robably" was "to talk about a number of things including Rule 22c-1." VanCook testified that he could not recall whether a 4:00 p.m. cutoff time was a subject of discussion because that "wasn't one of the important things to me in that conversation." The ALJ and SEC understandably found VanCook's claims of hypomnesia to be incredible.

[6] Again, VanCook testified that he did not "remember ever telling [Pritchard] that or ever talking about it with him."

a hearing before an ALJ was held April 28-30, 2008. At the hearing, VanCook admitted that he "frequently" allowed Goodwin and Simpson to "call in with their final trading orders after 4 p.m.," and he did not deny that he allowed Millennium to do the same. However, in a post-hearing written submission to the ALJ, VanCook insisted that he believed the procedure he had followed with these customers – timestamping their proposed trading sheets at the time of receipt, even if final orders came in after 4:00 – "would have satisfied any '4:00 p.m. rule.'" VanCook also insisted that he was unaware his activities were improper at the time he engaged in them. When asked at the hearing when he learned of Rule 22c-1's requirements regarding the calculation of mutual funds' NAVs, VanCook testified: "I don't know when I knew that. I'm sure sometime in August or September of '03 it was made very clear to me."

The ALJ found VanCook's claims not credible. See Pritchard Capital Partners, LLC, Exchange Act Release No. 350, 93 SEC Docket 2046, 2008 WL 2695730 (ALJ July 10, 2008) (initial decision). The ALJ noted that VanCook had been a part of numerous conversations "that informed him the late trading scheme was illegal," id. at *14; that his testimony was "deliberately vague," id. at *13; that the contrary testimony from Goodwin, Pillai, and Murray was detailed and believable, id.; and that, given VanCook's background in the securities industry and his extensive experience working with market timing mutual funds, he must have known "when the mutual funds' NAVs were calculated" and understood "the application of [] Rule 22c-1 pricing requirements to mutual fund trades," id. at *15.

The ALJ issued an initial decision in favor of the SEC's Division of Enforcement, ruling that VanCook's conduct constituted "a scheme to defraud Banc of America, and its mutual fund clients and their shareholders, in connection with the purchase or sale of securities within the meaning of Exchange Act Section 10(b) and Rule 10b-5." Id. at *15. The ALJ further concluded that VanCook had aided and abetted and willfully caused Pritchard Capital's violations of the recordkeeping provisions in Section 17(a)(1) of the Securities Exchange Act, and Rule 17a-3(a)(6) thereunder, by failing to record telephonic trade orders that he received after 4:00 p.m. Id. at *16-17.

The ALJ imposed a cease-and-desist order against future late-trading and recordkeeping violations, and barred VanCook "from association with any broker or dealer or investment company." Id. at *19. In addition, the ALJ ordered VanCook to disgorge the portion of his total compensation received from late trading between March 2001 and July 2003, an amount the ALJ determined to be $538,565.70, plus prejudgment interest. Id. at *19. The ALJ also ordered VanCook to pay a $100,000 civil penalty because VanCook's violations "involve[d] fraud and disregard for the regulatory requirement," "created a significant risk of substantial loss to other persons," and "resulted in significant pecuniary gains to VanCook." Id. at *20.

**B. Opinion of the SEC**

VanCook petitioned the SEC for review of the ALJ's decision. The SEC agreed with the ALJ that VanCook violated Section 10(b), Rule 10b-5, Section 17(a)(1), and Rule 17a-3(a)(6). The SEC disagreed with the ALJ only as to the calculation of disgorgement;

13

the SEC concluded that the ALJ's disgorgement figure should be reduced "to more closely align the figure with the approximate frequency of late trading in which Goodwin admittedly engaged." Joseph John VanCook, Exchange Act Release No. 61,039A, 97 SEC Docket 777, 2009 WL 4026291, at *17 (Nov. 20, 2009). The SEC's recalculation reduced the amount of disgorgement by $5,331.69 ("ten percent of the value of the fees received by VanCook from Goodwin") to $533,234.01, plus prejudgment interest. Id. at *18.

Pursuant to 15 U.S.C. § 78y(a)(1), VanCook now asks us to vacate the SEC's decision.

## DISCUSSION

## I. Standard of Review

As noted above, we will affirm the SEC's findings of fact if supported by substantial evidence. See Valicenti Advisory Servs., 198 F.3d at 64; 15 U.S.C. §§ 80b-13(a), 78y(a)(4). We will set aside the SEC's action, findings, and conclusions of law only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see also D'Alessio v. SEC, 380 F.3d 112, 120 (2d Cir. 2004). We will not disturb the SEC's choice of sanction unless it is "unwarranted in law or without justification in fact." Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 186 (1973) (internal quotation marks and alterations omitted).

## II. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

14

promulgated thereunder, 17 C.F.R. § 240.10b-5, are among the antifraud provisions of the federal securities laws that "prohibit the use of fraudulently misleading representations in the purchase or sale of securities." SEC v. Parklane Hosiery Co., 558 F.2d 1083, 1085 n.1 (2d Cir. 1977). Section 10(b) prohibits, inter alia, the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it

> unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To establish a violation of Section 10(b) and Rule 10b-5, the SEC must

> prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device. Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud; or at least knowing misconduct. Whether or not a given intent existed, is, of course, a question of fact.

SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted). The

15

Supreme Court has directed lower courts to interpret Section 10(b) and Rule 10b-5 "flexibly" and broadly, rather than "technically [or] restrictively." SEC v. Zandford, 535 U.S. 813, 819 (2002) (internal quotation marks omitted). "Section 10(b) was designed as a catch-all clause to prevent fraudulent practices," Chiarella v. United States, 445 U.S. 222, 226 (1980), including not just "garden type variet[ies] of fraud" but also "unique form[s] of deception" involving "[n]ovel or atypical methods," Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 11 n.7 (1971) (internal quotation marks omitted).

We have no trouble concluding that VanCook's late-trading scheme constituted a "device, scheme, or artifice to defraud," in violation of subsection (a) of Rule 10b-5; that, by designing and operating his late-trading scheme, and by taking numerous steps to hide it, VanCook made material, untrue statements and omissions, in violation of subsection (b); and that his actions "operate[d] . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security," in violation of subsection (c). 17 C.F.R. § 240.10b-5. We further agree with the SEC's conclusion that VanCook's submission of late-trade orders constituted an implied misrepresentation because it suggested "that final orders were received before the funds' 4:00 p.m. pricing time, as reflected in the applicable prospectus language, . . . when, in fact, the trading decisions were made after 4:00 p.m. The mutual funds therefore were deceived into thinking that the trades were made before 4:00 p.m. and into giving the trades that day's NAV." VanCook, 2009 WL 4026291, at *8.

VanCook contests the SEC's conclusion concerning Rule 10b-5 that – in his words

16

– "the mere transmission of trade orders to BOA after 4:00 p.m., without more, deceived mutual funds into believing that VanCook had received the trade orders before 4:00 p.m." He further argues that he never deceived or made misrepresentations to anyone, and was merely "associated" with the late-trading scheme. He contends that his role in the scheme is therefore insufficient to establish Rule 10b-5 liability. These arguments are wholly unavailing. VanCook understates his role in the scheme, mischaracterizes the SEC's factual findings, and misinterprets the relevant law.

The SEC plainly did *not* find Rule 10b-5 liability solely on the basis of "mere transmission of trade orders . . . after 4:00 p.m.," as VanCook claims. On the contrary, the Commission found that VanCook had "engaged in numerous deceptive acts in furtherance of the deceptive late-trading scheme." VanCook, 2009 WL 4026291, at *8. Examples of VanCook's deceptive acts cited by the SEC in its opinion include his "secur[ing] a new clearing broker for [Pritchard Capital Partners] knowing that its order entry system, MFRS, provided an opportunity to place orders after 4:00 p.m. and still receive that day's NAV, unlike the Firm's previous clearing broker"; his use of "time-stamped trade sheets to disguise the fact that [his] customers made trading decisions after the close of trading"; and his false assurances to Pritchard that he "had not been allowing customers to place orders after 4:00 p.m. and had never done so."[7] Id. at *8-9.

_____

[7] VanCook contends that, even if he made deceptive statements to Pritchard, those statements were not "in connection with the purchase or sale of securities by the mutual funds" and therefore cannot trigger liability under Section 10(b) or Rule 10b-5. We need not decide whether VanCook's statements to Pritchard would, by themselves, constitute a

17

Furthermore, VanCook was not "[m]erely associated" with the late-trading scheme, as he asserts; he was its architect. As the SEC found, VanCook was "intimately involved with the creation, marketing, and implementation of the system that enabled [Simpson, Goodwin, and Millennium] to late trade," and he "communicated his deceptive acts to the mutual funds at issue by submitting late-trading orders to them through" BOA. Id. at *10. This is far more than "association" with a deceptive scheme. As the Commission made clear in its opinion, VanCook "engage[d] in acts that were directly linked to the deception practiced upon the mutual funds." Id.

VanCook cites United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008), for his proposition that "merely communicating a trade order, without more, is not a communicative act that can support a finding of deceptive misrepresentation or omission under the securities laws." VanCook's reliance on Finnerty is misplaced. First, as the ALJ and SEC explained in great detail, VanCook did *not* "merely communicat[e] trade order[s]," but rather took a series of actions over several years to implement a scheme that he devised, as discussed above.

Second, Finnerty is clearly distinguishable, on its facts and its reasoning, from the present case. The criminal defendant in Finnerty was a specialist on the floor of the NYSE

Section 10(b) or Rule 10b-5 violation, as there is ample evidence in the record of other deceptive conduct by VanCook that clearly did constitute such a violation. The statements to Pritchard do, however, lend further support to the Commission's conclusion that VanCook knew that his late-trading scheme was unlawful and took steps to hide his actions. As the Commission points out, "VanCook's false statements made it less likely that his submission of late trades would be discovered."

18

whose job was to match executable orders from public customers; he was accused of trading for his own proprietary account and generating profits for himself. The government argued that because this type of trading, known as interpositioning, violated NYSE rules, Finnerty had also violated Section 10(b), because his customers had expected Finnerty to abide by those rules and Finnerty had implicitly misled them. We concluded that there was "no evidence" in the record that, through his interpositioning, Finnerty had "conveyed an impression that was misleading" to his victims. Id. at 149-50. We noted that the government had "identified no way in which Finnerty communicated anything to his customers, let alone anything false." Id. at 148-49. It was not sufficient that the customers might have "expected that Finnerty would not engage in" interpositioning simply because NYSE rules prohibit the practice; we held that "unless [the customers'] understanding was based on a statement or conduct by Finnerty, he did not commit a primary violation of Section 10(b)." Id. at 150.

In the present case, by contrast, VanCook did not merely violate an NYSE rule that customers might or might not have expected him to follow; he violated the mutual funds' own express wishes, as set out in their prospectuses, that trades would be executed by 4:00 p.m. in order to receive that day's NAV. VanCook took steps to make it appear to any outside observer – even after an examination of Pritchard Capital's internal records – that his customers' buy and sell orders had been finalized by 4:00 p.m., when in fact the critical decisions were not made until well after the close of market.

Furthermore, Finnerty did not involve an allegation of "a violation of subsection

19

(b)" of Rule 10b-5, id. at 147, whereas the present case does involve such an allegation (along with allegations that VanCook violated subsections (a) and (c)).  Subsection (b) provides that it is unlawful for covered persons "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  The SEC argues that VanCook's late-trading scheme violated this provision because it constituted an implied representation to mutual funds that, because their orders received the current day's NAV, the orders must have been entered by 4:00 p.m.  As the Commission's brief points out, in Finnerty we did not have the opportunity "to consider the implied representation principle that underlies the Commission's finding that VanCook's submission of late trades was deceptive."[8]  We now have that opportunity.  We agree with the Commission that by submitting orders after that time for execution at the current day's NAV, VanCook made an implied representation that the orders had been received before 4:00 p.m., because such late trading "incorporates an implicit

_____

[8] In addition, as the Commission notes, we decided Finnerty before the SEC had issued any "interpretation to which Chevron deference was required regarding the deceptive nature of interpositioning by an NYSE specialist."  The Commission has since issued a formal adjudicatory decision on the subject, concluding that, inter alia, by becoming a specialist "Finnerty expressly represented to the NYSE that he would comply with its rules" and that "[b]y engaging in undisclosed interpositioning and trading ahead in contravention of [his] duties and representations . . . Finnerty engaged in deceptive conduct."  David A. Finnerty, Exchange Act Release No. 59,998, 95 SEC Docket No. 2534, 2009 WL 1490212, at *3 (May 28, 2009).  This later interpretation of Rule 10b-5 "trumps" our prior interpretation in Finnerty.  See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982 (2005).

20

misrepresentation" by "falsely mak[ing] it appear that the orders were received by the intermediary before [4:00 p.m.] when in fact they were received after that time." Other courts have reached similar conclusions. See, e.g., SEC v. Pentagon Capital Mgmt. PLC, 612 F. Supp. 2d 241, 261 (S.D.N.Y. 2009); SEC v. Simpson Capital Mgmt., Inc., 586 F. Supp. 2d 196, 204-05 (S.D.N.Y. 2008); In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845, 856-58 (D. Md. 2005). We now join them, and conclude that late trading of the sort committed by VanCook constitutes an implied misrepresentation in violation of Rule 10b-5 and Section 10(b). See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158 (2008) (noting that "[c]onduct itself can be deceptive," and liability under Section 10(b) and Rule 10b-5 does not require "a specific oral or written statement").

Given the implied misrepresenation that VanCook made by engaging in late trading, as well as the outright misrepresentations that he made by covering up his actions and the evidence that he knew his actions were unlawful, we conclude that the SEC did not err in finding that VanCook violated Rule 10b-5 and Section 10(b) by designing and operating his late-trading scheme.

### III. Section 17(a)(1) and Rule 17a-3(a)(6)

Section 17(a)(1) of the Exchange Act provides that covered entities – a group that includes Pritchard Capital and VanCook – "shall make and keep" any records that the Commission "prescribes as necessary or appropriate." 15 U.S.C. § 78q(a)(1). Rule 17a-3(a)(6), promulgated under that Section, states that covered brokers and dealers "shall make and keep current . . . [a] memorandum of each brokerage order, and of any other

21

instruction, given or received for the purchase or sale of securities, whether executed or unexecuted," and that the memorandum "shall show," inter alia, "the terms and conditions of the order or instructions and of any modification or cancellation thereof," "the time the order was received," and "the time of entry," which is defined as "the time when the member, broker or dealer transmits the order or instruction for execution." 17 C.F.R. § 240.17a-3(a)(6)(i). The requirement that the order memo include "the time the order was received" was added to the Rule by an October 2001 amendment, see Books and Records Requirements for Brokers and Dealers, Exchange Act Release No. 44,992, 76 SEC Docket 343, 2001 WL 1327088 (Oct. 26, 2001), which became effective on May 2, 2003, see 66 Fed. Reg. 55818-01, 55826 (Nov. 2, 2001).

It is uncontested that Pritchard Capital failed to timestamp or otherwise record the times it received final trading decisions from Millennium, Simpson, and Goodwin, in violation of the amended Rule that became effective in May 2003. It is also uncontested that between May 2003 and September 2003 – after the amendment to the Rule and the clear directive from Seale and Thomas Pritchard to cease late trading – VanCook continued to engage in late trading and to omit from order memos the times that final trading instructions arrived from Millennium, Simpson, and Goodwin. VanCook argues, however, that he cannot be held liable for aiding and abetting or causing Pritchard Capital's recordkeeping violations because he did not know "that the protocol used by

himself was improper or illegal."[9]  VanCook further contends that the Commission's findings as to VanCook's role in the recordkeeping violations were either "not supported by substantial evidence" or were capricious and an abuse of discretion.

VanCook devotes only two pages of his 36-page brief to this argument, and no wonder – it borders on the frivolous.  The best VanCook can manage is to claim that he lacked the requisite scienter for a willful violation of the recordkeeping rules because it was someone else's job "to keep current with the requirements of technical rules such as the minutia of record keeping strictures."  He contends that his "failure to recognize or implement the new rule in the first few months of existence cannot justify a finding against him *personally*."  VanCook also asserts that "the Commission adduced no evidence that VanCook was aware of any implications of the new recordkeeping requirements."

VanCook's argument strains credulity.  To establish that VanCook aided and abetted Pritchard Capital's recordkeeping violations, the SEC needed only to find (1) that Pritchard Capital committed those violations; (2) that VanCook provided "substantial assistance" to the firm in the commission of those violations; and (3) that VanCook had

---

[9] The SEC asserts that "VanCook failed to raise his current argument regarding scienter for aiding and abetting liability" before the Commission, and this Court therefore "lacks jurisdiction to consider the argument."  That is incorrect.  In his petition for review of the ALJ's initial decision dated July 21, 2008, VanCook argued that "[e]ven if one assumes, for the sake of argument, that Pritchard Capital was a primary violator of the rule by not time stamping or otherwise recording the time of the receipt of the final trading decision, VanCook did not aid and abet in that violation because he was not, even generally, aware that the protocol used by McMahon and himself was improper or illegal."  Thus, VanCook properly raised his scienter argument.

23

knowledge of the violations.  15 U.S.C. § 78t(e).

There is ample evidence in the record from which the SEC could conclude that VanCook had actual knowledge of Pritchard Capital's recordkeeping violations and of his role in furthering them.  It was VanCook himself – and McMahon, at VanCook's direction – who failed to record the actual times that final trading instructions arrived from the late-trading customers, Millennium, Simpson, and Goodwin.  As the Commission noted, Pritchard Capital's recordkeeping violations resulted directly from the late-trading scheme that VanCook himself designed, and VanCook's and McMahon's "fail[ure] to record the time that [Millennium, Simpson, and Goodwin] made their actual final trading decisions" was a central part of VanCook's late-trading strategy.  VanCook, 2009 WL 4026291, at *14.  The scheme was specifically designed to create a false impression that the customers' trade orders had been finalized by 4:00 p.m., which was not the case.  Moreover, VanCook was repeatedly warned that his scheme was unlawful, and was directed to stop it.  Thus, sufficient evidence in the record supports the SEC's finding that VanCook had actual knowledge that the firm's records were inaccurate, because he himself had designed a scheme to make them so, and that VanCook therefore deliberately aided and abetted Pritchard Capital's violations of Rule 17a-3(a)(6) and Section 17(a)(1).

## IV. Sanctions

VanCook argues that the sanctions imposed by the Commission – permanently barring him from any association with a broker or dealer or registered investment company, disgorging him of $533,234.01 plus interest, and fining him $100,000 – were "excessive, draconian, and disproportionate to the activity in which [he] was found to have engaged." We disagree. The Commission acted within its discretion in imposing these sanctions.

First, VanCook contends that any disgorgement amount should be calculated starting from the May 2003 conference call between VanCook, Thomas Pritchard, Seale, one of the firm's hedge-fund customers, and an associate of that customer. Prior to that call, VanCook insists, he did not have "sufficient knowledge to form the scienter necessary to violate Rule 10b-5." He argues that "any restitution order, at a maximum, should be limited to $74,534.59," which he says is the amount of the commissions received by Pritchard Capital from its late-trading customers from May 1, 2003, through July 2003.

It is true that we have sometimes "refused, on due process grounds, to defer to the SEC's imposition of sanctions where 'doing so would penalize an individual who has not received fair notice of a regulatory violation.'" D'Alessio v. SEC, 380 F.3d 112, 123 (2d Cir. 2004), quoting Upton v. SEC, 75 F.3d 92, 98 (2d Cir. 1996). But we have also long recognized that the Due Process Clause of the Constitution requires only that "'laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"

25

<u>Upton</u>, 75 F.3d at 98, quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972). VanCook had ample notice of the antifraud provisions of the securities laws long before the May 2003 conference call. He was a longtime securities professional with extensive experience in the industry, and a co-owner of Pritchard Capital. Substantial evidence in the record, as discussed supra, supports the conclusion that VanCook knew how and when NAVs were calculated and devised a scheme to manipulate that process to his advantage. He took numerous steps to hide the late-trading scheme, including by lying to Pritchard, his firm's principal.

In addition, VanCook wooed customers with the late-trading scheme that he had designed, and assured them that it was legal, even in the face of attorney advice to the contrary. We agree with the Commission that VanCook "repeatedly ignored numerous 'red flags'" that his conduct was illegal, including the guidelines in the mutual funds' prospectuses and in BOA's Processing Guide, warnings from Millennium's attorney in January 2003 and his own firm's attorney in May 2003, and his conversations with Thomas Pritchard. <u>VanCook</u>, 2009 WL 4026291, at *13. VanCook refused to heed any of these warnings. We therefore see no reason that the SEC should have limited the amount of disgorgement to the commissions earned between May 2003 and July 2003.

As to the $100,000 civil penalty imposed by the SEC, VanCook argues simply that, "particularly in light of the massive disgorgement award, and its associated interest," the fine "was excessive." However, he makes no argument that the fine was "unwarranted in law or without justification in fact." <u>Butz v. Glover Livestock Comm'n Co.</u>, 411 U.S. 182,

26

185-86 (1973) (internal quotation marks and alteration omitted).  We see no basis for decreasing the amount of the fine, which the ALJ and SEC deemed necessary for purposes of deterrence and to reflect the seriousness of VanCook's violations, among other reasons.

VanCook argues, more generally, that the sanctions were "disproportionate compared with other sanctions handed out to" Pillai, McMahon, and Pritchard, each of whom received lighter sanctions than VanCook.  He notes that "Pillai was ordered to pay $1 in disgorgement and a $150,000 civil penalty" and subjected to a 12-month suspension; that McMahon "was only censured, and subject to a cease and desist order," but "was not ordered to pay any restitution [or] penalty"; and that Pritchard was suspended from associating "in a supervisory capacity with any broker/dealer for nine months," received a $50,000 civil penalty, and was not ordered to disgorge any profits.

We defer substantially to the SEC's choice of sanctions, though that deference is not absolute.  Courts of appeals have in the past "shown our willingness to overturn Commission penalties that we concluded were draconian" – including, for example, where the petitioner "had confronted an unclear regulatory environment and had relied on advice of counsel that ultimately proved to be wrong," and where the petitioner was part of a class subjected to a "systematic pattern of disparate treatment" by the SEC.  D'Alessio, 380 F.3d at 124 (emphasis omitted) (citing cases).  None of those factors is present here.  Instead, VanCook argues simply that the Commission should have imposed sanctions on him more similar to those imposed on the other players in his late-trading scheme.  But each of these players committed different offenses; VanCook, unlike the other individuals,

designed the late-trading scheme, marketed it to select customers, and orchestrated its execution. Furthermore, as he himself points out, other individuals chose to settle with the SEC, whereas VanCook chose to litigate. That "dissimilar facts resulted in dissimilar sanctions does not . . . show that the sanction imposed [on VanCook] was disproportionate." Id. at 125.

Because we find no error in the SEC's choice of sanctions here – much less any "gross abuse of discretion," Tager v. SEC, 344 F.2d 5, 9 (2d Cir. 1965) – we conclude that the SEC acted within its discretion in sanctioning VanCook as it did.

## CONCLUSION

For the foregoing reasons, VanCook's petition for review is denied, and the order of the SEC is affirmed.

28