08-6166-cv(L)
Capital Management Select Fund Ltd., et al. v. Bennett et al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: October 19, 2009          Decided: January 10, 2012)

Docket Nos.  08-6166-cv(L) 08-6167-cv (Con) 08-6230-cv (Con)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAPITAL MANAGEMENT SELECT FUND LTD., INVESTMENT & DEVELOPMENT
FINANCE CORPORATION, IDC FINANCIAL S.A., GLOBAL MANAGEMENT
WORLDWIDE LIMITED, individually and on behalf of all others
similarly situated, ARBAT EQUITY ARBITRAGE FUND LIMITED,
RUSSIAN INVESTORS SECURITIES LIMITED, VR GLOBAL PARTNERS, L.P.,
PATON HOLDINGS, LTD., VR CAPITAL GROUP LTD., and VR ARGENTINA
RECOVERY FUND LTD.,

             Plaintiffs-Appellants,

                    v.

PHILLIP R. BENNETT, PHILIP SILVERMAN, ROBERT C. TROSTEN,
RICHARD N. OUTRIDGE, SANTO C. MAGGIO, LEO R. BREITMAN, GRANT
THORNTON LLP, TONE N. GRANT, and REFCO GROUP HOLDINGS, INC.,

             Defendants-Appellees,

JOSEPH J. MURPHY, RONALD O'KELLEY, NATHAN GANTCHER, DENNIS A.
KLEJNA, PERRY ROTKOWITZ, CREDIT SUISSE GROUP, CREDIT SUISSE
FIRST BOSTON, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO.,
BANK OF AMERICA SECURITIES, LLC, BANK OF AMERICA CORP, MERRILL
LYNCH & CO, MERRILL LYNCH PIERCE, FENNER & SMITH INCORPORATED,
JP MORGAN CHASE & CO, JP MORGAN SECURITIES, INC., SANDLER
O'NEIL & PARTNERS, L.P., HSBC HOLDINGS, PLC, HSBC SECURITIES
{USA} INC., WILLIAM BLAIR & COMPANY, LLC, HARRIS NESBITT CORP.,
CMG INSTITUTIONAL TRADING, LLC, SAMUEL A. RAMIREZ & CO., INC.,
THE WILLIAMS CAPITAL GROUP, L.P., UTENDAHL CAPITAL PARTNERS,
L.P., REFCO SECURITIES, LLC, THL ENTITIES,

             Defendants,

BANK FUR ARBEIT UND WIRTSCHAFT UND OSTERREICHISCHE POSTPARKASSE AKTIENGESELLSEHAFT, GERALD M. SHERER, WILLIAM M. SEXTON, THOMAS H. LEE PARTNERS, LP, THOMAS H. LEE ADVISORS, LLC, THL MANAGERS V, L.L.C., THL EQUITY ADVISORS V, LLP, THOMAS H. LEE EQUITY FUND V, L.P., THOMAS H. LEE PARALLEL FUND V, LP, THOMAS H. LEE EQUITY (CAYMAN) FUND V, LP, THOMAS H. LEE INVESTORS LIMITED PARTNERSHIP, 1997 THOMAS H. LEE NOMINEE TRUST, THOMAS H. LEE, DAVID V. HARKINS, SCOTT L. JAECKEL, SCOTT A. SCHOEN,

        Consolidated-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER and POOLER, Circuit Judges.[*]

    Appeal from an order entered by the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge), dismissing plaintiffs' claims under Section 10(b) for failure to plead deceptive conduct.  We affirm.

SCOTT A. EDELMAN (Sander Bak & Michael Shepherd, on the brief), Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Plaintiffs-Appellants; Co-Lead Counsel for Lead Plaintiffs and the Putative Class.

Richard L. Stone (Mark A. Strauss, on the brief), Kirby McInerney & Squire LLP, New York, New York, for Plaintiffs-Appellants; Co-Lead Counsel for Lead Plaintiffs and the Putative Class.

Claire P. Gutekunst, Jessica Mastrogiovanni, and Jed Friedman,

_____

[*]This panel originally included the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation; however, Judge Rakoff has recused himself.  Therefore, this case is decided by the remaining judges in accordance with Second Circuit Internal Operating Procedure E(b).

2

Proskauer Rose, LLP, New York, New York, for Defendant-Appellee Richard N. Outridge.

Barbara Moses, Judith L. Mogul, and Rachel Korenblat, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York, for Defendant-Appellee Robert C. Trosten.

Stuart I. Friedman, Ivan Kline, and Jonathan Daugherty, Friedman & Wittenstein P.C., New York, New York, for Defendant-Appellee William M. Sexton.

LINDA T. COBERLY and Bruce R. Braun, Winston & Strawn LLP, Chicago, Illinois, for Defendant-Appellee Grant Thornton LLP.

Laura E. Neish, Zuckerman Spaeder LLP, New York, New York, for Defendant-Appellee Tone N. Grant.

David V. Kirby, Krantz & Berman, LLP, New York, New York, for Defendant-Appellee Philip Silverman.

Susan S. McDonald, Jacob H. Stillman, Mark D. Cahn, and David M. Becker, Securities and Exchange Commission, Washington, D.C., for Amicus Curiae Securites and Exchange Commission.

RICHARD A. ROSEN (Walter Rieman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Greg A. Danilow, on the brief, Weil Gotshal & Manges LLP, New York, New York, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for Defendants THL Partners.

WINTER, Circuit Judge:

Former customers ("RCM Customers") of Refco Capital Markets, Ltd. ("RCM"), a subsidiary of the now-bankrupt Refco, Inc., appeal from Judge Lynch's dismissal of their Section 10(b) securities fraud claims against former corporate officers of Refco and Refco's former auditor, Grant Thornton LLP.[1] Appellants claim that appellees breached the agreements with the RCM Customers when they rehypothecated or otherwise used securities and other property held in customer brokerage accounts.

The district court dismissed the claims for lack of standing and failure to allege deceptive conduct, see In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., No. 06 Civ. 643, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ("RCM I"); In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172 (S.D.N.Y. 2008) ("RCM II"); In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., Nos. 06 Civ. 643, 07 Civ. 8686, 07 Civ. 8688, 2008 WL 4962985 (S.D.N.Y. Nov. 20, 2008) ("RCM III") (on a motion for reconsideration).

We hold that appellants have no remedy under the securities laws because, even assuming they have standing, they fail to make sufficient allegations that their agreements with

---

[1] A group of defendants associated with Thomas H. Lee Partners, L.P., a private equity firm that at relevant times held a majority interest in Refco (the "THL Defendants") were also appellees; however, the appeal against those parties is hereby dismissed pursuant to a joint stipulation.

RCM misled them or that RCM did not intend to comply with those agreements at the time of contracting.  We therefore affirm.

BACKGROUND

On an appeal from a grant of a motion to dismiss, we review de novo the decision of the district court.  See Staehr v. Hartford Fin. Servs. Group, 547 F.3d 406, 424 (2d Cir. 2008).  We construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).  "To survive a motion to dismiss, however, a complaint must allege a plausible set of facts sufficient to raise a right to relief above the speculative level."  S.E.C. v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011).

a)  The Parties and Their Businesses

Capital Management Select Fund Limited and other named appellants[2] are investment companies, which, along with members

---

[2] This appeal arises from three separate actions that were consolidated at the pretrial phase:  RCM I, 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) (the "Class Action"); VR Global Partners, L.P. et al. v. Bennett et al., No. 07 Civ. 8686, 2007 WL 4827764 (S.D.N.Y. filed Oct. 9, 2007) (the "VR Action"; and Capital Management Select Fund Ltd. v. Bennett, No. 07 Civ. 8688, 2007 WL 4837768 (S.D.N.Y. filed Oct. 9, 2007) (the "Capital Management Action"). Lead plaintiffs in the original Class Action are Global Management Worldwide Ltd., Arbat Equity Arbitrage Fund Ltd., and Russian Investors Securities Ltd.  All three lead plaintiffs in the Class Action are commonly controlled investment funds.  Plaintiffs in the VR Action are VR Global Partners, L.P., Paton Holdings Ltd., VR Capital Group Ltd., and VR Argentina Recovery Fund, Ltd. (collectively "VR Plaintiffs").  In their complaint, VR Plaintiffs describe themselves as "private investment funds," each of which operates as either a limited liability partnership or limited liability company registered in Grand Cayman.  Plaintiffs in the Capital Management Action are Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial S.A.  Capital Management is an investment company incorporated under

5

of the putative class, held assets in securities brokerage accounts with RCM. RCM is one of three principal operating subsidiaries of the now-bankrupt Refco, a publicly traded holding company that, through its operating subsidiaries, provided trading, prime brokerage, and other exchange services to traders and investors in the fixed income and foreign exchange markets. Appellees are various former officers and directors of Refco and/or its affiliates (the "Refco Officer Defendants"), and Refco's former auditor, Grant Thornton, LLP.

RCM operated as a securities and foreign exchange broker that traded in over-the-counter derivatives and other financial products on behalf of its clients. Although RCM was organized under the laws of Bermuda and represented itself as a Bermuda corporation, it operated from New York at all relevant times. These operations were under the leadership of, and through a sales force of account officers and brokers employed by, its affiliated corporation, Refco Securities, LLC, ("RSL"), a wholly-owned subsidiary of Refco that operated as a U.S.-based broker-dealer registered with the SEC.

b) Brokerage Account Customer Agreements

RCM Customers held securities and other assets in non-discretionary securities brokerage accounts with RCM pursuant

the laws of the Bahamas. Investment & Development Finance is an investment company incorporated under the laws of the British Virgin Islands. IDC Financial is an investment company incorporated under the laws of Panama.

to a standard form "Securities Account Customer Agreement" with RCM and RSL (the "Customer Agreement"). RCM Customers' securities and other property deposited in their accounts were not segregated but were commingled in a fungible pool. As a result, no particular security or securities could be identified as being held for any particular customer. Such a practice is common in the brokerage industry. See Levitin v. PaineWebber, Inc., 159 F.3d 698, 701 (2d Cir. 1998) ("Customer accounts with brokers are generally not segregated, e.g. in trust accounts. Rather, they are part of the general cash reserves of the broker."); U.C.C. § 8-503 cmt. 1 ("[S]ecurities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers."); Adoption of Rule 15c3-2 Under the Securities Exchange Act of 1934, Exchange Act Release No. 34-7325, 1964 WL 68010, *1 (1964) ("[W]hen [customers of broker-dealers] leave free credit balances with a broker-dealer the funds generally are not segregated and held for the customer, but are commingled with other assets of the broker-dealer and used in the operation of the business.").

The Customer Agreement included a margin provision that permitted RCM Customers to finance their investment transactions by posting securities and other acceptable property held in their accounts as collateral for margin loans extended by RCM. Under the margin provision, RCM, upon

7

extending a margin loan to a customer, had the right to use or "rehypothecate"[3] the customer's account securities and other property for RCM's own financing purposes. For example, RCM might pledge customers' securities as collateral for its own bank loans or sell the securities pursuant to repurchase agreements ("repos").[4] The parties dispute whether the rehypothecation rights were limited to securities serving as collateral or whether they also included securities that were excess collateral. We discuss this dispute, infra.

We briefly provide a generic background. From an ex ante perspective, such margin provisions provide distinct, but related, economic benefits to both the brokerage and its customers. For the customers, the margin provision provides the ability to invest on a leveraged basis and thereby earn amplified returns on their investment capital. As for the brokerage, the ability to rehypothecate its customers' securities presents, among other things, an additional and inexpensive source of secured financing. See Michelle Price,

---

[3] Rehypothecation technically refers to a broker's re-pledging of securities held in its customer's margin account as collateral for a bank loan. Similarly, a broker may sell the securities through a repurchase agreement, which is functionally equivalent to a secured loan. See infra Note 4. Hereinafter we will refer to rehypothecation in the general sense -- i.e., a broker's use and/or pledging of its customer's margin account securities to obtain financing for its own transactions.

[4] A repurchase agreement is an agreement involving the simultaneous sale and future repurchase of an asset. In a typical repurchase agreement, the original seller buys back the asset at the same price at which he sold it, with the original seller paying the original buyer interest on the implicit loan created by the transaction. See In re Comark, 124 B.R. 806, 809 n.4 (Bankr. C.D. Cal. 1991).

*Picking over the Lehman Carcass - Asset Recovery*, Banker, Dec. 1, 2008, *available at* 2008 WLNR 24064913 ("[Without rehypothecation rights] the prime broker would have to use its unsecured credit facilities, the cost of which is currently in the region of 225 to 300 basis points above that of secured credit.").

While these types of margin provisions provide economic benefits to both parties, like any creditor-debtor arrangement they also create counterparty risks. The brokerage bears the risk that its customers default on margin loans that could become under-secured due, for example, to a precipitous decline in the value of the posted collateral. Likewise, of course, the customers face the possibility that the brokerage, having rehypothecated its customers' securities, fails, making it unable to return customer securities after those customers meet their margin debt obligations.

Counterparty risks associated with margin financing have long been recognized by industry participants and regulators alike. In the United States, for example, margin financing has

been subject to federal[5] and state[6] regulation, and, even longer still, to self-imposed limitations by brokers and self-regulating organizations.[7]  In general, margin restrictions attempt to reduce the counterparty risk associated with margin financing by limiting the types of securities that can be posted by an investor as collateral for a margin loan and limiting the amounts that can be borrowed against that collateral.[8]

Similarly, at least in the United States, brokers' rehypothecation activities have long been restricted by federal[9] and state law,[10] and by rules promulgated by the

---

[5] Federal regulation of margin financing for securities purchases was introduced in the 1913 Federal Reserve Act. See Board of Governors of the Federal Reserve System, A Review and Evaluation of Federal Margin Regulations 45 (1984).  After the 1929 stock market crash, Congress imposed sweeping regulation of margin financing under the Exchange Act, 15 U.S.C. §§ 78a to 78hh-1.  Statutory authority for regulating margin financing was granted under Section 7 of the Act.  See id. § 78g.

[6] State regulation of margin financing generally arises under Article 8 of the Uniform Commercial Code.

[7] The New York Stock Exchange ("NYSE") first established margin restrictions for exchange members in 1913 when it required its members to impose margin levels that were "proper and adequate."  See Board of Governors of the Federal Reserve System, supra, at 45.  The NYSE currently restricts customer margin levels under NYSE Rule 431 which, inter alia, limits the amount of credit that can be used by a customer to purchase securities. See NYSE Rule 431, available at 2003 WL 25658590.

[8] See, e.g., Federal Reserve Board Regulation T, 12 C.F.R. § 200.1 et seq. (imposing initial and maintenance margin requirements on investors purchasing securities on margin); see also Federal Reserve Board Regulation U, 12 C.F.R. § 221.1 et seq. (similar margin restrictions applicable to banks and other lenders); Federal Reserve Board Regulation X, 12 C.F.R. § 224.1 et seq., (similar margin restrictions applicable to margin loans not explicitly covered by other regulations).

[9] The SEC first restricted brokers' rehypothecation rights with the adoption of Rule 8c-1, 17 C.F.R. § 240.8c-1, and Rule 15c2-1, 17 C.F.R. § 240.15c2-1, in 1940.  In general, these rules prohibit the following

10

principal stock exchanges.[11]  These restrictions generally limit a broker's ability to commingle its customers' securities without their consent, and limit a broker's rehypothecation rights with respect to a customer's "excess margin securities" i.e., securities not deemed collateral to secure a customer's outstanding margin debt, and "fully-paid securities, " i.e., securities in a cash account for which full payment has been made.[12]

The upshot of these restrictions is that in the United States, brokers and investors alike are limited in the amount of leverage that is available to amplify returns.  However, since the development of globalized capital and credit markets, investors have sought to avoid these limitations by seeking unrestricted margin financing through, among other sources, unregulated offshore entities.  See, e.g., Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp., 303 F. Supp. 1354 (S.D.N.Y. 1969)

activities without first obtaining consent from the customer:  (i) commingling of the securities of different customers as collateral for a loan; (ii) commingling a customer's securities with its own under the same pledge; and (iii) pledging a customer's securities for more than the customer owes.  See Statement of Commission Issued in Connection with the Adoption of Rules X-8C-1 and X-15-C2-1, Exchange Act Release No. 2690, 1940 WL 974 (1940).

[10] See Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 88-95, pt. 1, at 406 (1963) (listing statutory hypothecation restrictions under the laws of Iowa, Michigan, Nebraska, and New York).

[11] Id. at 405-07 (listing rehypothecation restriction rules of the various exchanges).

[12] See, e.g., SEC Rule 15c3-3 (prohibiting a broker from rehypothecating an amount of customer's collateral in excess of 140 percent of the customer's outstanding margin debt), 17 C.F.R. § 240.15c3-3.

(leveraged buyout of Metro-Goldwyn-Mayer financed through the Eurodollar market, thus avoiding U.S. margin restrictions); Martin Lipton, Some Recent Innovations to Avoid the Margin Regulations, 46 N.Y.U. L. Rev. 1 (1971). In recent years, U.S.-based broker-dealers have satisfied investor demand for unrestricted margin financing by providing financing to institutional investors, -- e.g., hedge funds -- through, inter alia, unregulated foreign affiliates that are not subject to U.S. margin or rehypothecation restrictions. See Noah Melnick et al., Prime Broker Insolvency Risk, Hedge Fund J., Nov. 2008 ("US prime brokers commonly rely on [foreign] unregulated affiliates for margin lending or securities lending and/or to act as custodians in non-US jurisdictions."); Sherri Venokur & Richard Bernstein, Protecting Collateral against Bank Insolvency Risk--Part I, Sept. 8, 2008, at 1 ("U.S. registered broker-dealers enter into derivatives transactions through their unregulated affiliates in order to reduce capital reserve requirements but also to be able to use counterparty collateral."); Roel C. Campos, SEC Comm'r, Remarks before the SIA Hedge Funds & Alternative Investments Conference (June 14, 2006) (noting that certain hedge fund financing is generally booked through foreign, unregulated affiliates).

In the instant case, RCM held itself out as, and the record indicates that at least some of the RCM Customers understood it to be, an unregulated offshore broker.

12

c) <u>The Lawsuit</u>

The event giving rise to this action is the collapse of Refco, RCM's now-bankrupt parent corporation. On October 20, 2005, a little more than two months after issuing an initial public offering of its stock, Refco announced a previously undisclosed $430 million uncollectible receivable and disavowed its financial statements for the previous three years. The uncollectible receivable stemmed, in part, from losses suffered by Refco and several of its account holders during the late 1990s. Rather than disclose its losses to the public and its investors at that time, Refco's management devised and implemented a "round robin" loan scheme to conceal the losses. The first part of this scheme involved Refco transferring its uncollectible receivables to the books of Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by appellee-defendant Phillip R. Bennett, Refco's then-President, CEO, and Chairman. Then, in order to mask the magnitude and related-party nature of the RGHI receivable, a Refco entity (alleged by plaintiffs typically to be RCM) would extend loans to multiple unrelated third parties that would in turn lend the funds to RGHI to pay down the uncollectible receivables. In this manner, Refco effectively eliminated the uncollectible related-party receivable from its books just prior to each relevant financial period but would unwind the loans shortly thereafter. The transactions allegedly took place over the course of six

13

years, between 1998 and 2004, and were never disclosed in Refco's public securities filings.  By 2004, the RGHI receivable had grown to an amount alleged to be in excess of $1 billion.

Prior to Refco's 2005 disclosure, beginning in late 2003, THL, a private equity investment fund that focuses on the acquisition of equity stakes in mid-to-large capitalization companies, began exploring investment opportunities in Refco, and ultimately completed a leveraged buyout in August 2004.

Following Refco's disclosure of its $430 million uncollectible receivable, customers holding accounts with RCM, including appellants, attempted to withdraw their assets from RCM.  This began the proverbial "run on the bank," and, on October 13, 2005, Refco announced a unilateral 15-day moratorium on all RCM trading activities.  On October 17, 2005, Refco, along with RCM and several other Refco affiliates, filed for Chapter 11 bankruptcy protection in the Southern District of New York.  In a December 30, 2005 bankruptcy filing, RCM disclosed that it owed its customers approximately $4.16 billion, while holding only $1.905 billion in assets.

Along with a host of other plaintiffs who brought actions in the wake of Refco's collapse,[13] on January 26, 2006,

---

[13] See Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett, No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007); Thomas H. Lee Equity Fund V, L.P. v. Bennett, No. 05 Civ. 9608, 2007 WL 950133 (S.D.N.Y. Mar. 28, 2007); In re Refco, Inc.,

14

plaintiff-appellant Global Management Worldwide Limited, an investment fund organized under the laws of Bermuda, filed a putative class action on behalf of all brokerage customers of RCM who held securities with RCM and/or RSL between October 17, 2000 and October 17, 2005.  On September 5, 2006, Global Management Worldwide filed a Consolidated Amended Class Action Complaint, in which Arbat Equity Arbitrage Fund Limited and Russian Investors Securities Limited, both "commonly controlled investment funds," were added as Co-Lead Plaintiffs of the putative class.  The amended complaint named appellees as defendants.  The complaint alleges that Refco's corporate officers caused RCM to improperly sell or lend securities and other assets from RCM Customers' trading accounts to various Refco affiliates in order to fund Refco's operations.  The complaint further alleges that this practice was approved by, and well known to, all members of Refco senior management.

On September 13, 2007, the district court dismissed the putative class action suit for plaintiffs' failure to allege deceptive conduct.  However, it granted plaintiffs leave to replead as to certain defendants.  RCM I, 2007 WL 2694469, at *12-13.  On October 9, 2007, two separate groups of plaintiffs -- one group associated with investment fund VR Global Partners, L.P., ("VR Plaintiffs"), and a second group

_____

No. 06 Civ. 1888, 2006 WL 1379616 (S.D.N.Y. May 16, 2006); In re SPhinX, Ltd., 371 B.R. 10 (S.D.N.Y. 2007).

15

associated with investment fund Capital Management Select Fund Ltd. ("CM Plaintiffs") -- filed individual actions based on allegations similar to those raised in the putative class action complaint. Thereafter, on November 20, 2007, the district court consolidated all three actions for pretrial purposes, subsequent to which the lead plaintiffs in the putative class action filed a Second Amended Complaint.

In the consolidated action, all plaintiffs alleged violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 against all Refco Officer Defendants, and violations of Rule 10b-16 against all Refco Officer Defendants who, together with RCM and Refco, allegedly extended margin credit to RCM Customers without adequately disclosing RCM's use of Customer securities. 15 U.S.C. §§ 78j(b), 78l (Sections 10(b) and 20(a) of the Exchange Act); 17 C.F.R. §§ 240.10b-5, .10b-16 (Rules 10b-5 and 10b-16). In addition, VR Plaintiffs alleged violations of Section 10(b) and Rule 10b-5 as against Grant Thornton.

On August 28, 2008, the district court granted motions to dismiss filed by various Officer Defendants and Grant Thornton. RCM II, 586 F. Supp. 2d at 174. In granting the motions to dismiss, the court rejected RCM Customers' Section 10(b) claim for lack of standing under the purchaser-seller rule of Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). RCM II, 586 F. Supp. 2d at 178-81. As a separate ground for dismissal,

16

the court ruled that plaintiffs failed to adequately plead deceptive conduct through any affirmative act or misrepresentation, breach of fiduciary duty, or any other manner. Id. at 181-94.

Finally, as to RCM Customers' Section 20(a) claims, the court concluded that because plaintiffs could not bring a claim against any defendant for a primary violation of Section 10(b) and Rules 10b-5 and 10b-16, plaintiffs necessarily lacked standing to bring a controlling person action under Section 20(a). Id. at 195.

In considering RCM Customers' request for leave to replead, the court first noted that all plaintiffs had the benefit of filing their complaints after the court's September 13, 2007 Opinion and Order, which detailed the deficiencies in the initial class-action pleading. Id. at 196. The court also observed that VR Plaintiffs and CM Plaintiffs all had more than adequate access to Refco's internal files, including books, records, and corporate minutes, as a result of their participation in the Refco bankruptcy proceeding. Id. Finding no indication that RCM Customers could provide additional facts to cure their pleading defects, the district court denied RCM Customers' request for leave to replead. Id.

On September 12, 2008, plaintiffs filed a motion to reconsider the district court's denial of leave to replead. In their motion, RCM Customers asserted that, given the

17

opportunity to replead, they would be able to establish deceptive conduct by showing that RCM improperly rehypothecated the Customers' fully-paid securities. The district court granted the motion for reconsideration but again denied RCM Customers leave to replead. RCM III, 2008 WL 4962985. The court determined that even if RCM Customers could establish deceptive conduct based on RCM's rehypothecation of fully-paid securities, plaintiffs still had no standing as "actual purchaser[s] or seller[s]" under Blue Chip Stamps. Id. at *3.

This appeal followed.

DISCUSSION

RCM Customers seek to recover under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). RCM Customers assert that they were deceived by, inter alia, the terms of the Customer Agreement and RCM's written Trade Confirmations, RCM's written account statements, and oral representations by certain appellees.

a) Section 10(b)

We turn first to Section 10(b), which makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The elements of a Section 10(b) claim are familiar to all federal courts. A plaintiff claiming fraud must allege scienter, "a

18

mental state embracing intent to deceive, manipulate, or defraud," <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007) (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)), and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference of scienter" is one that is "more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." <u>Tellabs</u>, 551 U.S. at 323-24. This strong inference of scienter can be established by alleging either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009).

Although no claim for breach of contract is pursued by appellants, the gravamen of their Section 10(b) claim is such a breach. Breaches of contract generally fall outside the scope of the securities laws. <u>See</u> <u>Gurary v. Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000) ("[T]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract and does not justify a Rule 10b-5 action . . . unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." (citation and internal quotation marks omitted) (quoting <u>Mills</u>

19

v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 2000))); Desert Land, LLC v. Owens Fin. Grp., Inc., 154 Fed. App'x. 586, 587 (9th Cir. 2005) ("[T]he mere allegation that a contractual breach involved a security does not confer standing to assert a 10b-5 action.").

However, although "[c]ontractual breach, in and of itself, does not bespeak fraud," Mills, 12 F.3d at 1176, it may constitute fraud where the breaching party never intended to perform its material obligations under the contract. See Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made."). Private actions may succeed under Section 10(b) if there are particularized allegations that the contract itself was a misrepresentation, i.e., the plaintiff's loss was caused by reliance upon the defendant's specific promise to perform particular acts while never intending to perform those acts. See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588 (2001) (defendant violated Section 10(b) when it sold a security while never intending to honor its agreement); Ouaknine v. MacFarlane, 897 F.2d 75, 81 (2d Cir. 1990) (Section 10(b) plaintiff adequately alleged facts to imply the defendants intended to deceive when they issued an offering memorandum); Luce v. Edelstein, 802 F.2d 49, 55-56 (2d Cir. 1986) (allowing Section 10(b) claim

20

where plaintiff alleged defendant's promises made in consideration for a sale of securities were known by defendant to be false); cf. Mills, 12 F.3d at 1176 (denying Section 10(b) claim because plaintiff alleged no facts probative of defendant's intent at contract formation).

We have also held that where a breach of contract is the basis for a Section 10(b) claim, the "promise . . . must encompass particular actions and be more than a generalized promise to act as a faithful fiduciary." Luce, 802 F.2d 55.

With respect to the present action, we add that a simple disagreement over the meaning of an ambiguous contract combined with a conclusory allegation of intent to breach at the time of execution will not do. Either the alleged breach must be of a character that alone provides "strong circumstantial evidence" of an intent to deceive at the time of contract formation, ECA, 553 F.3d at 198, or there must be allegations of particularized facts supporting a "cogent and compelling" inference of that intent, Tellabs, 551 U.S. at 324; Int'l Fund Mgmt. S.A. v. Citigroup Inc., Nos. 09 Civ. 8755, 10 Civ. 7202, 10 Civ. 9325, 11 Civ. 314, 2011 WL 4529640, at *9 (S.D.N.Y. Sept. 30, 2011). In the present case, there are no particularized allegations of fact supporting such an inference of deceptive intent at the time of execution of the Customer Agreements. Therefore, the requisite intent must be inferred, if at all, from the Customer Agreement itself and the nature of the alleged breach.

21

b)   The Customer Agreement as a Misrepresentation

RCM Customers claim that they were deceived into believing that their securities and other assets would be safeguarded, and, in particular, that RCM would not rehypothecate excess margin or fully-paid securities.  They allege that, in fact, RCM routinely rehypothecated all of its customers' securities, regardless of the customers' outstanding margin debt, and did so from the start of each customer's account.  The allegations as to RCM's conduct are sufficient to satisfy the element of intent at the time of contract formation.  The crux of the issue, therefore, is whether RCM's rehypothecation of securities even when they were not deemed collateral was so inconsistent with the provisions of the Customer Agreement that the Agreement was itself a deception.[14]

Section B[15] of the Customer Agreement establishes the

---

[14] There is no issue regarding the financial sophistication of the RCM Customers.  They are investment funds with access to the finest advisory resources.  Indeed, all plaintiffs have alleged that, from the outset, they knew of, and were sensitive to, the counterparty risk associated with a broker-dealer's rehypothecation of its customers' securities.

[15] Section A of the Customer Agreement clearly indicates that RCM Customers' accounts were non-discretionary.  This section states, in relevant part:

A.    **AUTHORIZATION**

**1. Authority to Act.**  You hereby authorize [RCM] to purchase, sell, borrow, lend, pledge or otherwise transfer Financial Instruments (including any interest therein) for your account in accordance with your oral or written instructions . . . Except to the extent you have expressly authorized someone else to buy, sell and otherwise effect Transactions on your behalf and for your account, all Transactions introduced to [RCM] by RSL on your behalf and entered into pursuant to this Agreement shall be initiated orally or in writing by you.

22

terms by which RCM would extend margin financing to RCM Customers, and provides in relevant part:

**B.  <u>MARGIN</u>**

This Margin section applies in the event [RCM] finances any of your Transactions from time-to-time in Financial Instruments.

1.  <u>**Security Interest.**</u> [RCM] reserves the right to require the deposit or maintenance of collateral (consisting of cash, United States government obligations or such other marketable securities or other property which may be acceptable to [RCM]) to secure performance of your obligations to [RCM]. . . . To secure your obligations under Transactions entered into pursuant to this Agreement, you hereby grant to [RCM] and its affiliates (collectively, "Refco Entities") a first priority, perfected security interest in all of your cash, securities and other property (whether held individually or jointly with others) and the proceeds thereof from time-to-time in the possession or under the control of such Refco Entities, whether or not such cash, securities and other property were deposited with such Refco Entities.

2.  <u>**Rights and Use of Margin.**</u> [RCM] shall have the right to loan, pledge, hypothecate or otherwise use or dispose of such cash, securities and other property free from any claim or right, until settlement in full of all Transactions entered into pursuant to this Agreement. [RCM's] sole obligation shall be to return to you such cash, like amounts of similar cash, securities and other property (or the cash value thereof in the event of any liquidation of collateral) to the extent they are not deemed to be collateral

---

App. 154.

Because RCM could not trade securities for RCM Customers' accounts without oral or written instructions, it is clear that RCM Customers' accounts were non-discretionary -- that is, RCM Customers, not RCM, had "control over the account[s] and ha[d] full responsibility for trading decisions." <u>de Kwiatkowski v. Bear, Stearns & Co., Inc.</u>, 306 F.3d 1293, 1302 (2d Cir. 2002).

to secure Transactions entered into pursuant to this Agreement with any Refco Entities or have not been applied against obligations owing by you to Refco Entities, whether as a result of the liquidation of positions and any Transactions entered into pursuant to this Agreement or otherwise.

App. 154.

Section B.1 states that upon RCM's extension of margin financing to a customer -- even a dime -- RCM would obtain a "first priority, perfected security interest in all of [RCM Customers'] cash, securities and other property (whether held individually or jointly with others) and the proceeds thereof." App. 154. Section B.1 also gave RCM the right to demand additional collateral in the event that a customer's collateral became insufficient to secure the customer's outstanding margin debt -- if, for example, the value of the customer's securities collateral decreased in value such that RCM's margin loan was under-secured.

In addition, Section B.2 states that, if a customer's securities are no longer deemed collateral to secure the customer's outstanding margin debt, RCM was obligated to "return" such securities to the customer. It is evident that the promised "return" did not contemplate either securities or their value being returned to the actual possession of the RCM Customers. Margin accounts move up or down with both the buying or selling by the customer and the price movements of the collateral. The constant transfer of collateral back and

24

forth between accounts in RCM's name or a customer's name would have imposed administrative costs on all parties, and no one argues that such constant transfers were required by the Customer Agreement. Moreover, all of the RCM Customers had to have been aware that, if RCM was not asking for more collateral, some of their securities were probably excess collateral. However, there is no allegation or indication that any RCM Customer ever noticed or complained about the lack of back-and-forth transfers.

In context, therefore, "return" must mean that, with respect to securities not deemed to be collateral, the customer could demand their return from the fungible pool. Moreover, in the case of a requested "return," RCM had the option of transferring physical securities or the "cash value thereof in the event of any liquidation of collateral." Thus, RCM, after rehypothecating all its customers' securities, could have satisfied a demand for "return" of excess securities by paying their cash value in lieu of the actual securities.

On review of the Customer Agreement, we conclude that it unambiguously warned the RCM Customers that RCM intended to exercise full rehypothecation rights as to the Customers' excess margin securities.

Stripped of verbiage not pertinent to this dispute and substituting a crude and colloquial description for the specified collateral, Sections B.1 and 2 read:

**B.** **Margin**

    This Margin section applies in the event [RCM] finances any of your Transactions . . . in [your account].

    **1.** **Security Interest.** [RCM] reserves the right to require . . . [appropriate stuff as] collateral . . . [T]o secure performance of your obligations to [RCM] . . . you hereby grant to [RCM] . . . a first priority, perfected security interest in all your [stuff] in the possession of . . . [Refco Entities] . . . .

    **2.** **Rights and Use of Margin.** [RCM] shall have the right to . . . use or dispose of such [stuff] free from any claim or right, until settlement in full of all Transactions . . . . [RCM's] sole obligation shall be to return to you such [stuff] . . . to the extent [it is] not deemed to be collateral to secure Transactions . . . .

App. 154.

Appellants' argument that the first use of "such [stuff]" in B.2 refers only to "stuff" deemed to be collateral is not consistent with the language of the agreement. The only referent for the first "such [stuff]" is "all your [stuff]" in B.1. Moreover, the second use of "such [stuff]" in B.2 is modified by "to the extent [it is] not deemed to be collateral," a most peculiar modifier if "such [stuff]" means only "stuff" deemed to be collateral.

RCM Customers also allege that RCM rehypothecated Customer assets at times that RCM Customers had no outstanding margin debt in breach of the Customer Agreement. However, the Customer Agreement provides only that the cash value of securities not

26

deemed collateral shall be "return[ed]" to the customers, i.e., recorded on RCM's books as money payable on demand to the particular customer. A perfectly plausible reading of the Agreement is that, on the occasions that some customers had no outstanding margin transactions, they had only a right to demand payment of the value of 100 percent of the securities that had been given to RCM.

There is, therefore, no disparity between the provisions of the Customer Agreement and RCM's conduct remotely supportive of a claim that the Agreement was a misrepresentation actionable under Section 10(b).

The Trade Confirmation also supports this conclusion. Section D.2 of the Customer Agreement incorporates the terms of the Trade Confirmation, which include, among other things, a reiteration of RCM's rights to "sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it." App. 712.

c) Consistency with Federal and State Law

RCM Customers also contend that our interpretation of Section B.2 is inconsistent with federal and/or state law and that ambiguities in the Customer Agreement should be construed to comply with applicable legal rules.[16] RCM Customers argue

_____

[16] Appellants also argue that the district court's interpretation was inconsistent with custom and practice, but they do not state what the customs and practices are or how they are inconsistent with this agreement. Absent allegations as to such customs and practices and given the clarity of the

27

that RCM was subject to SEC Rules 15c3-1, 17 C.F.R. § 240.15c3-1, and 15c3-3, 17 C.F.R. § 240.15c3-3,[17] and New York state law, which would have limited RCM's rehypothecation rights with respect to excess margin securities.  However, even assuming arguendo the existence of ambiguities in the Customer Agreement, we disagree.

The district court rejected these arguments regarding federal law based on our decision in United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008).  RCM II, 586 F. Supp. 2d at 191-92.  Finnerty held that a defendant may be liable under Section 10(b) and Rule 10(b)(5) for violation of a NYSE rule only if the defendant had made a representation regarding compliance with the rule.  Finnerty, 533 F.3d at 149-50.  The district court concluded that because plaintiffs made no allegations that "RCM (or any Refco affiliate or employee) made any representation that RCM was subject to, or would comply with, any such regulations, much less [Rules 15c3-1 and 15c3-3]," RCM could not

---

Customer Agreement and Trade Confirmations, we will not discuss this claim further.

[17] SEC Rule 15c3-1, the so-called Net Capital Rule, generally requires brokers and dealers to maintain sufficient capital to protect their customers from the firm's potential insolvency, see 17 C.F.R. § 240.15c3-1, and Rule 15c3-3, the so-called Customer Protection Rule, requires brokers and dealers to obtain and maintain physical possession or control of all fully-paid and excess margin securities in a customer's account.  See 17 C.F.R. § 240.15c3-3(b)(1).  Under Rule 15c3-3, "excess margin securities" is defined as those securities in the customer's account whose market value exceeds 140 percent of the customer's outstanding margin debt.  17 C.F.R. § 240-15c3-3(a)(5).  Thus, the Customer Protection Rule prohibits a broker from rehypothecating a customer's margin account securities in excess of 140 percent of the customer's outstanding margin debt.

be found liable under Section 10(b) and Rule 10b-5 for violating Rules 15c3-1 and 15c3-3.  RCM II, 586 F. Supp. 2d at 192.

Here, more than simply remaining silent as to whether it was complying with U.S. law, RCM represented that it was not a U.S.-regulated company.  Although RCM did state that it was subject to "all applicable laws" in the trade confirmations, that simply raises the question of what laws were applicable. In short, RCM's alleged violation of federal law does not in and of itself constitute deceptive conduct.

The Security and Exchange Commission has expressed a concern, as amicus curiae, that affirming the district court in this regard will viscerate the so-called "shingle theory" of broker-dealer liability under Section 10(b), and will be inconsistent with our recent decision in VanCook v. SEC, 653 F.3d 130 (2d Cir. 2011).  We disagree.

Under the shingle theory, a broker makes certain implied representations and assumes certain duties merely by "hanging out its professional shingle."  Grandon v. Merrill Lynch & Co., Inc., 147 F.3d 184, 192 (2d Cir. 1998).

In VanCook, we held that VanCook's late-trading practice "violated [Rule 10b-5] because it constituted an implied representation to mutual funds that" VanCook was complying with a rule restricting late-trading.  VanCook, 653 F.3d at 141.  We reasoned that "by submitting orders after that time for execution at the current day's [Net Asset Value], VanCook made

29

an implied representation that the orders had been received before 4:00 p.m., because such late trading incorporates an implicit misrepresentation by falsely making it appear that the orders were received by the intermediary before 4:00 p.m. when in fact they were received after that time." Id. at 140-41 (internal quotation marks and alterations omitted). We also noted that VanCook's scheme violated his employer "mutual funds' own express wish's, as set out in their propectuses," id. at 140, and involved "steps to make it appear to any outside observer . . . that his customers' . . . orders had been finalized by 4:00 p.m.," id. Based in part on the explicit and implied misrepresentations, we affirmed the order of the SEC that VanCook violated Rule 10b-5 and Section 10(b). Id. at 141.

However, the facts alleged in the instant matter do not, as asserted by appellant, give rise to liability based on "conduct inconsistent with an implied representation; specifically a broker-dealer's implied representation under the 'shingle theory' that it will deal fairly with the public in accordance with the standards of the profession." Appellants' 18(j) Letter at 2. Surely, RCM's affirmative representations that it was not a U.S.-regulated company trump any implied representation under the shingle theory.

Indeed, we have previously denied shingle theory claims against a broker that made adequate explicit disclosure with regard to the subject matter of the claimed implied duties. See

30

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 111 (2d Cir. 2005) (denying plaintiffs' Rule 10b-5 claim under the shingle theory because defendant disclosed allegedly excessive markups). In the instant case, RCM's Customer Agreement and its standard form Trade Confirmation expressly disclosed RCM's rehypothecation rights as well as RCM's status as an offshore unregulated entity. These disclosures were made in conjunction with a bargained-for agreement between sophisticated counter-parties that could be expected to understand the relevant benefits and risks. Thus, there is no liability under the shingle theory.

The terms of the Customer Agreement indicated that, insofar as RCM was acting as executing broker for its customers, RCM was not purporting to comply with the Rules in question but was relying on the safe harbor from broker registration provided under SEC Rule 15a-6, 17 C.F.R. § 240.15a-6. In general, Rule 15a-6 exempts from the federal broker-dealer registration requirements of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o, "foreign entities engaged in certain activities involving U.S. investors and securities markets." *See* *Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27,017, 54 Fed. Reg. 30013, 30013 (July 18, 1989). In particular, Rule 15a-6(a)(3) exempts from registration foreign

brokers[18] that induce or attempt to induce trades in securities by "major U.S. institutional investors" and "U.S. institutional investors" so long as any trades are "effected through" a U.S.-registered broker-dealer and various conditions are met both by the foreign broker and the registered dealer that effects the trades.  See 17 C.F.R. § 240.15a-6(a)(3)(i)(A).

Section G.1 of the Customer Agreement, entitled "Respective Status of [RCM] and RSL," provides in relevant part:

> [RCM] and RSL are all wholly owned subsidiaries of the Refco Group Ltd., LLC, a US corporation. RSL is a US corporation and a broker-dealer registered with the US Securities and Exchange Commission. [RCM] is a Bermuda Corporation.

App. 156-57.

This language clearly indicates that RSL is a U.S. corporation and registered with the SEC, thereby implying that RSL would comply with SEC regulations.  However, Section G.1 represents RCM only as a Bermuda Corporation and makes no suggestion that RCM was registered with the SEC or would comply with federal securities regulations.  Furthermore, the Customer Agreement's frequent references to RSL as "introducing"

---

[18] Under Rule 15a-6, a "foreign broker or dealer" is defined as:

> [A]ny non-U.S. resident person (including any U.S. person engaged in business as a broker or dealer entirely outside the United States, except as otherwise permitted by this rule) that is not an office or branch of, or a natural person associated with, a registered broker or dealer, whose securities activities, if conducted in the United States, would be described by the definition of "broker" or "dealer" in sections 3(a)(4) or 3(a)(5) of the Act.

17 C.F.R. § 240.15a-6(b)(3).

transactions to RCM on the customers' behalf clearly represented that trades executed at RCM for its customers would be "effected through" RSL to RCM in accordance with the requirements of Rule 15a-6(a)(3)(i)(A).[19]

Accordingly, whether or not RCM was technically in compliance with the Rule 15a-6(a)(3) safe harbor,[20] the Customer Agreement clearly represented that RCM undertook no obligation to comply with Rules 15c3-1 and 15c3-3.

Similarly, to the extent that RCM was acting as its customers' prime broker, RCM undertook no apparent obligation to comply with federal securities laws, including Rules 15c3-1 and 15c3-3. Section G.1 of the Customer Agreement establishes the role and function of RCM when acting as prime broker and states:

> <u>Trades Executed Away From [RCM], but cleared by [RCM] (Prime Brokerage)</u> –- [RCM] acts as your clearing, settlement and financing agent (your prime broker) in connection with Transactions executed at your Executing Broker(s). Where [RCM] is acting as your prime broker, no [RCM] entity is involved in executing Transactions.

App. 157.

---

[19] Although RCM would have been exempt from registration under Rule 15a-6, RSL, as introducing broker, would have been required to comply with Rules 15c3-1 and 15c3-3, because, pursuant to Rule 15a-6, the U.S.-registered broker through which transactions between the U.S. customer and the foreign broker are effected retains responsibility for, <u>inter</u> <u>alia</u>, complying with Rules 15c3-1 and 15c3-3. <u>See</u> 17 C.F.R. §§ 240.15a-6(3)(iii)(A)(5),(6). Thus, to the extent that trades were executed by RCM for its customers, with RSL acting as introducing broker, it was RSL, not RCM, that bore the responsibility of complying with Rules 15c3-1 and 15c3-3.

[20] RCM Customers cite in their complaint a draft memorandum from Refco's counsel, Mayer, Brown, Rowe & Maw LLP, expressing counsel's view that RCM was unable to rely on the exemption from U.S. registration provided by Rule 15a-6.

The SEC has defined "prime broker" as "a registered broker-dealer that clears and finances the customer trades executed by one or more other registered broker-dealers ('executing broker') at the behest of the customer." Prime Broker Comm. Request, SEC No-Action Letter, 1994 WL 808441, at *1 (Jan. 25, 1994). The Commission requires prime brokers to comply with certain federal securities laws, including Rules 15c3-1 and 15c3-3. Id. at *11. However, insofar as RCM was not a U.S.-registered broker-dealer, and thus not a "prime broker" for purposes of complying with U.S. federal securities laws, RCM, when acting in its role as prime broker, was not representing that it would comply with Rules 15c3-1 and 15c3-3.[21] We therefore conclude that the Customer Agreement represented that RCM intended to exercise full rehypothecation rights without being subject to the Rules in question.

RCM Customers also assert that RCM was subject to New York General Business Law Section 339-e, which, in general, restricts a broker's rehypothecation rights with respect to fully-paid or excess margin securities. N.Y. Gen. Bus. Law § 339-e (McKinney 2004). RCM Customers argue that Section 339-e applies because Section H of the Customer Agreement and Paragraph 6 of the Trade

---

[21] We cannot, from the pleadings, reach any conclusions as to whether, at the time it rehypothecated its customers' securities, RCM was acting as executing broker or prime broker. Nor can we make any conclusions as to whether RCM and/or RSL were actually in compliance with Rules 15a-6, 15c3-1 or 15c3-3. Such conclusions are not, however, pertinent to our disposition of this matter.

Confirmation specified that the agreement would be governed by, and construed in accordance with, New York law. In particular, Section H of the Customer Agreement, entitled "**LAW AND JURISDICTION**," reads:

> This Agreement shall be governed by and construed with New York law and you agree that the courts of New York, located in the Borough of Manhattan (Federal or State), are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement. Any suit, action or proceedings arising out of or in connection with this Agreement ("Proceedings") commenced by you, may only be brought in New York. [RCM] may take proceedings against you in New York (Federal or State) or any other court of competent jurisdiction, US or otherwise. The taking of Proceedings by [RCM] in one or more jurisdictions does not preclude the taking of Proceedings by [RCM] in any other jurisdiction, whether concurrently or not. You irrevocably waive (and irrevocably agree not to raise) any objection which you may have now or subsequently to [RCM's] laying of the venue of any Proceedings in any court and any claim that any such Proceedings have been brought in an inconvenient forum.

App. 157.

The district court determined that Section H constituted a choice of law provision that governed only the Customer Agreement itself. RCM II, 586 F.Supp.2d at 192 n.27. However, RCM Customers assert that Section H establishes that New York law governed the overall relationship between RCM and RCM Customers, including RCM's use of RCM Customers' collateral. We agree with the district court. Section H neither created, nor represented, any affirmative obligations on RCM to conform to

35

New York margin-lending restrictions.[22]  By its clear terms, the provision was included only as a choice of law and venue provision that would govern should any conflicts arise "out of or in connection with" the Customer Agreement.

d)  <u>The Account Statements as a Misrepresentation</u>

In addition to their deception-in-the-contract argument, appellants also claim that the monthly account statements sent by RCM were deceptive because those statements identified security positions that were "In Your Account" and other securities as "Open Financing Transactions," indicating that the latter were being held as collateral.  They argue that these statements implied that the securities held "In Your Account" were not being rehypothecated but were being held on behalf of the customer.

However, no such inference could reasonably have been drawn by a signatory to the Customer Agreement, which gave RCM the right to rehypothecate all securities, whether excess collateral or not, as discussed <u>supra</u>.  Based on the terms of the Customer Agreement, the distinction between collateral securities and

---

[22] The Trade Confirmation also did not create, deceptively or otherwise, an inference that New York law would apply.  Paragraph 6 of the Trade Confirmation provides that:

> All transactions between RCM and you shall be subject to all applicable laws, rules, practices and customs and to the terms of the applicable customer agreement and of any other written agreement between you and RCM.

App. 712.  This provision cannot be portrayed as deceptive in this matter because neither the Trade Confirmation nor the Customer Agreement state which bodies of laws are "applicable."

non-collateral securities had no bearing on rehypothecation rights, but rather on what securities, or the equivalent cash value thereof, customers could withdraw from their account. Thus, these statements do not purport to make any representation, deceptive or otherwise, about what securities may or may not have been rehypothecated.

e) <u>Oral Statements by RCM Representatives</u>

RCM Customers also allege that oral statements made by RCM representatives were deceptive. They state that during discussions about the RCM Customers' desire for low-risk investments and a safe place to hold securities, RCM representatives stated that: (i) RCM did not engage in proprietary trading; (ii) their business involved only executing, clearing, and financing trades in exchange for commissions and interest payments; and (iii) RCM's securities financing business was a matched-book, which insulated RCM from direct market risk.[23] Appellants argue that, in context, these statements created the perception that RCM was "a dependable custodian" for their securities and would not rehypothecate excess margin securities.

However, none of these statements had any bearing on how RCM intended to use excess margin securities. They state only that RCM's business was that of a broker-dealer and that it took

---

[23] In a matched-book business, a broker accepts securities as collateral for a loan and then uses those same collateral securities to borrow funds, thereby offsetting its exposure to risk that the original loan will become under-secured.

37

steps to limit its risk. No reasonable, much less sophisticated, investor would understand these statements as an affirmative representation that RCM would not rehypothecate excess margin securities.

Moreover, any doubt was removed by the terms of the Customer Agreements, which granted RCM the right to rehypothecate all customer securities whenever a customer had a margin balance and the right to return customer securities in the form of cash. These provisions clearly represented that securities might be tied up in transactions even when not deemed to be collateral. Therefore, the only affirmative statements by RCM concerning the rehypothecation of customer securities were the terms of the Customer Agreement, which were not deceptive.[24]

## CONCLUSION

We have also considered appellants' remaining claims and find them without merit. For the foregoing reasons, we affirm.

---

[24] We note two additional matters. First, RCM Customers do not argue that the alleged oral misrepresentations constitute a fraud independent of their rehypothecation claims. Second, if the oral statements might be taken to suggest that RCM would not rehypothecate excess margin securities, there is caselaw holding that "the written statement controls the oral one." Ambrosino v. Rodman & Renshaw, Inc., 972 F.2d 776, 786 (7th Cir. 1992) (quoting Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985)).