In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-1899, 12-2009

CITY OF LIVONIA EMPLOYEES' RETIREMENT
    SYSTEM and LOCAL 295/LOCAL 851,
    IBT EMPLOYER GROUP WELFARE FUND,
    individually and on behalf
    of all others similarly situated,

*Plaintiffs-Appellants/*
*Cross-Appellees,*

*v.*

THE BOEING COMPANY,
    W. JAMES MCNERNEY, JR., and
    SCOTT E. CARSON,

*Defendants-Appellees/*
*Cross-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 7143—**Suzanne B. Conlon**, **Ruben Castillo**, *Judges.*

ARGUED FEBRUARY 25, 2013—DECIDED MARCH 26, 2013

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. These appeals present questions—substantive, procedural, and also relating to sanctions for attorney misconduct—arising from the plaintiffs' claim that the Boeing Company, along with its chief executive officer (McNerney) and the head of its commercial aircraft division (Carson), committed securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The suit, filed as a class action, does not specify a damages figure, but at argument the plaintiffs' lawyer indicated that the class was seeking hundreds of millions of dollars in damages. The district court (Judge Conlon—who later recused herself and was replaced by Judge Castillo, but as she made all the rulings at issue in the appeal we'll pretend she was the only judge) dismissed the suit under Rule 12(b)(6) before deciding whether to certify a class. The plaintiffs' appeal challenges the dismissal while the defendants' cross-appeal challenges the failure of the district court to impose sanctions on the plaintiffs' lawyers for violating Fed. R. Civ. P. 11.

Section 10(b) of the Securities Exchange Act forbids any person "to use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . or for the protection of investors." 15 U.S.C. § 78j(b). And Rule 10b-5 of the Securities and Exchange Commission, one of the rules

authorized by the statute, forbids a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The Supreme Court has interpreted Rule 10b-5 to require proof of the defendant's "scienter," *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)—that is, that he either knew the statement was false or was reckless in disregarding a substantial risk of its being false. See also *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007); *Capital Management Select Fund, Ltd. v. Bennett*, 680 F.3d 214, 225 (2d Cir. 2012). "Recklessness" in this context has been defined in a number of cases as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." E.g., *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, *supra*, 513 F.3d at 704; *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977); *In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 702 (9th Cir. 2012); *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1299-1300 (11th Cir. 2011); *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 76 (2d Cir. 2001); cf. *Ernst & Ernst v. Hochfelder*, *supra*, 425 U.S. at 193 n. 12.

The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, altered the landscape of federal securities fraud litigation in four respects

that bear on our case. First, it requires a plaintiff who is complaining about "forward-looking" statements—predictions or speculations about the future—to prove "actual knowledge" of falsity on the part of defendants, not merely reckless indifference to the danger that a statement is false. 15 U.S.C. § 78u-5(c)(1)(B); see *Slayton v. American Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 243-44 (5th Cir. 2009); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554-55 (6th Cir. 2001) (en banc).

Second, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added), rather than a mere inference. But except with regard to "forward-looking" statements, the Act does not specify "the required state of mind," so it remains scienter. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 600-01 (7th Cir. 2006), vacated and remanded on other grounds, 551 U.S. 308 (2007); see also *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, *supra*, 513 F.3d at 705; *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407-09 (5th Cir. 2001); *Helwig v. Vencor, Inc.*, *supra,* 251 F.3d at 550-51.

The Supreme Court has glossed "strong inference" to mean that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The plaintiff therefore "must plead facts rendering an inference of scienter *at least as likely as* any

plausible opposing inference." *Id.* at 328 (emphasis in original).

Third, the heavy burden of pleading that the Act places on plaintiffs induces their lawyers to seek out confidential sources of information about the defendant in advance of filing a complaint—a problematic endeavor, as well illustrated by this case.

And fourth, the Act requires the district judge, even if neither side files a Rule 11 motion, to determine each party's compliance with the rule and to impose sanctions if at the end of the case he finds that the rule has been violated. 15 U.S.C. §§ 78u-4(c)(1), (2).

The suit is on behalf of all persons who bought common stock of Boeing between May 4 and June 22, 2009. The key allegations of the first amended complaint (amended early in the pretrial proceedings) were as follows. On April 21 of that year Boeing performed a stress test on the wings of its new 787-8 Dreamliner, a plane that had not yet flown. The wings failed the test; metal strips called "stringers," designed to shift weight from the wings to the fuselage, failed to do so adequately. Yet Boeing announced on May 3 that "all structural tests required on the static airframe prior to first flight are complete" and that "the initial results [of the test] are positive" (though it also said that the data obtained in the test had not yet been fully analyzed). The implication was that the plane was on track for its "First Flight," which had been scheduled for June 30. "First Flight," which denotes the first time a new model of an airplane flies, is an important milestone in the develop-

ment of a new model, though not the final milestone—thousands of hours of additional flight testing are necessary before the plane can begin commercial operation. See, e.g., Federal Aviation Administration, "FAA Approves Production of Boeing 787 Dreamliner," Aug. 26, 2011, www.faa.gov/news/press_releases/ news_ story.cfm?newsId=13064 (the websites cited in this opinion were visited on Feb. 27, 2013).

In mid-May, after making some changes in the design of the stringers, Boeing conducted another test. Although the plane failed that test too, defendant McNerney stated publicly that he thought the plane would fly in June. Later defendant Carson told *Bloomberg* that the Dreamliner "definitely will fly" this month (June). Susanna Ray & Rishaad Salamat, "Boeing Says Delayed 787 Is Capable of Flying Today," *Bloomberg*, June 16, 2009, www.bloomberg.com/apps/news?pid=newsarchive&sid= a14yY7nEglDY.

The biennial Paris Air Show began in the middle of June. Of course the Dreamliner did not fly in the show; it had never been expected to. But at the show Boeing executives made presentations concerning the Dreamliner and its development schedule. Yet on June 23, four days after the show ended, Boeing announced that the First Flight of the Dreamliner had been canceled because, Carson explained, of an "anomaly" revealed by the stringer tests. He said that Boeing had hoped to be able to solve the problem in time for a First Flight in June, but had been unable to do so. In fact the First Flight did not take place until December 2009.

When Boeing announced the cancellation of the First Flight, it also announced that the cancellation would cause a delay of unspecified length in the delivery of the Dreamliner, which many airlines had already ordered. In the two days after these announcements, Boeing's stock price dropped by more than 10 percent. The plaintiff class consists of persons who bought Boeing stock between the tests and the announcements of the cancellation and of the delay in delivery and who therefore lost money when the price dropped.

The district judge dismissed the first amended complaint, the one we've just summarized, for failure to create a strong inference that the defendants had acted with scienter. The complaint did not indicate whether McNerney, Carson, or anyone else who had made optimistic public statements about the timing of the First Flight knew that their optimism was unfounded. The complaint was not inconsistent with the defendants' having had a realistic hope that the defects in the stringers revealed by the tests could be eliminated quickly, without requiring postponement of the flight. Time may have been needed to digest the information produced by the tests and conclude from it that the First Flight would have to be delayed.

"There is no securities fraud by hindsight." *Fulton County Employees Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047, 1050-51 (7th Cir. 2012); *In re Ceridian Corp. Securities Litigation*, 542 F.3d 240, 248 (8th Cir. 2008); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). The law does not require public disclosure

of mere *risks* of failure. No prediction—even a prediction that the sun will rise tomorrow—has a 100 percent probability of being correct. The future is shrouded in uncertainty. If a mistaken prediction is deemed a fraud, there will be few predictions, including ones that are well grounded, as no one wants to be held hostage to an unknown future.

Any sophisticated purchaser of a product that is still on the drawing boards knows, moreover, that its market debut may be delayed, or indeed that the project may be abandoned before it yields salable product. The purchasers of the Dreamliner protected themselves against the possibility of delay in delivery by reserving the right to cancel their orders; there are no allegations regarding cancellation penalties, or for that matter penalties imposed on Boeing for delivery delays. And therefore had the defendants known before the Paris Air Show that the First Flight would have to be postponed, they would have had, so far as appears, little incentive to delay the announcement of the postponement until the show closed. True, the Paris Air Show is the industry's biggest trade show and attracts heavy media coverage. But it was not the deadline for airline companies to cancel their orders for the Dreamliner. A delay of five weeks (from May 17, the date of the second test, to June 23, the announcement of the indefinite postponement of the First Flight) would not affect cancellations. All it would do—if the defendants knew on May 17 that the First Flight would be delayed indefinitely (and this became known)—would undermine

Boeing's credibility with its customers and expose the company to a multi-hundred million dollar lawsuit for securities fraud. The buyer of a $200 million dollar airplane (Boeing, "Commercial Airplanes: Jet Prices: 787 Family," 2012, www.boeing.com/commercial/prices/index.html) will not overlook bad news about the plane merely because the news emerged a few days after the industry trade show rather than before or during it.

Without a motive to commit securities fraud, businessmen are unlikely to commit it. *Slayton v. American Express Co., supra*, 604 F.3d at 776-77; *R2 Investments LDC v. Phillips*, 401 F.3d 638, 644-45 (5th Cir. 2005). A more plausible inference than that of fraud is that the defendants, unsure whether they could fix the problem by the end of June, were reluctant to tell the world "we have a problem and maybe it will cause us to delay the First Flight and maybe not, but we're working on the problem and we hope we can fix it in time to prevent any significant delay, but we can't be sure, so stay tuned." There is a difference, famously emphasized by Kant, between a duty of truthfulness and a duty of candor, or between a lie and reticence. There is no duty of total corporate transparency—no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in "real time," forming a running commentary, a baring of the corporate innards, day and night.

Of course the fact that a prediction *may* prove untrue does not justify representing as true a prediction that one knows, to a reasonable certainty, is false. See, e.g., *Consoli-*

*dation Services, Inc. v. Keybank National Ass'n*, 185 F.3d 817, 823 (7th Cir. 1999); *Restatement (Second) of Torts* § 530 (1977). But unless the complaint created a strong inference that McNerney and Carson, who made the allegedly false statements about the timing of the First Flight, knew they were false, there would be no fraud to impute either to them or to Boeing. No other employee of Boeing is accused of having made such statements within the scope of his employment, thereby triggering corporate liability in accordance with the doctrine of respondeat superior. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, *supra*, 513 F.3d at 708; *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 251-52 (3d Cir. 2009); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1354 (11th Cir. 2008).

All that the first amended complaint alleged regarding what McNerney and Carson knew about the likely postponement of the First Flight was that their knowledge was confirmed by "internal e-mails" of Boeing. The reference to *internal* e-mails implied that someone inside Boeing was aiding the plaintiffs. But as no such person was identified, the judge could not determine whether such emails—without which no "strong inference" that the defendants had committed fraud was even remotely possible—existed.

Allegations concerning—in the first amended complaint merely implying—unnamed confidential sources of damaging information require a heavy discount. The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may

even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms. *Higginbotham v. Baxter Int'l, Inc., supra*, 495 F.3d at 756-57; *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); compare *Makor Issues & Rights, Ltd. v. Tellabs Inc., supra*, 513 F.3d at 711-12; cf. *Institutional Investors Group v. Avaya, Inc., supra*, 564 F.3d at 261-63. The district judge therefore rightly refused to give any weight to the "internal e-mails" to which the complaint referred.

The judge's dismissal of the first amended complaint was without prejudice, however, and so the plaintiffs could file a second amended complaint. And they did. This one gave particulars about the confidential source (there was just one), an engineer later revealed to be Bishnujee Singh. The complaint described him as a "Boeing Senior Structural Analyst Engineer and Chief Engineer" who had worked on wing-stress tests of the Dreamliner and who as part of his job had "had direct access to, as well as first-hand knowledge of the contents of, Boeing's 787 stress test files that memorialize the results of the failed 787 wing" tests of April and May 2009. According to the complaint those files included "internal, contemporaneous communications regarding the specific results of the" tests and the engineers' analysis of the results, plus "copies of internal electronic communications to defendants McNerney and Carson . . . informing [them] that" the tests had failed and that the failure might result in a delay of the

Dreamliner's First Flight. On the basis of these allegations, which were purportedly based on interview notes by an investigator (Elizabeth Stewart) retained by the plaintiffs' lawyers, the district judge denied the defendants' Rule 12(b)(6) motion to dismiss the second amended complaint.

No one had bothered to show the complaint to Singh, however, and investigation by Boeing soon revealed that the complaint's allegations concerning him could not be substantiated. Some clearly were false: He had never been employed by the company. He had been employed by a contractor for Boeing. And although the contractor had been involved in wing tests for the Dreamliner, Singh's role in or knowledge of those tests, or of any communications to the individual defendants, was and is unknown, but it is highly improbable that he either was involved in the tests or was privy to internal communications with top officials of the company.

Deposed by defendants' counsel, Singh denied virtually everything that the investigator had reported. He denied that he had been doing work for Boeing when the tests were conducted. He denied that he had ever worked on the Dreamliner 787-8, the model in question; he had worked on the 787-9, a later model. He denied having knowledge of or access to internal Boeing communications regarding the tests on the 787-8. The plaintiffs argue that he lied at his deposition because he wanted to stay in Boeing's good graces; left unexplained is why he would not have wanted to remain in those good graces when he was interviewed by the investigator.

Karim Mustafa, the lead engineer for the team working on the 787-9 of which Singh was a member, declared under oath that Boeing had restricted access to the Dreamliner test results to those with a job-related need for the information, which Singh did not have with respect to the 787-8, because he wasn't working on that model. The declaration further stated that Singh would have had to obtain Mustafa's permission as well as that of Boeing's management to obtain access to internal company files concerning engineering work on the Dreamliner, and that he did not give Singh such permission. Indeed Mustafa himself had no access to files relating to the 787-8, since his assignment was the 787-9.

On the basis of these revelations concerning the so-called confidential source, the defendants asked the judge to reconsider her denial of their motion to dismiss the second amended complaint. She reconsidered—and dismissed the complaint, this time with prejudice, precipitating the parties' appeals. She did not try to determine when Singh had been lying and when telling the truth, or whether he had never lied but the investigator had misunderstood or misrepresented what he had told her. Noting that none of the plaintiffs' lawyers had met or talked to Singh until six months after they filed the second amended complaint, even though the first amended complaint had alleged reliance on internal Boeing communications, the judge thought their failure to attempt to verify the allegations in the investigator's notes amounted to a fraud on the court.

Until Singh's deposition the plaintiffs' lawyers had vouched for the accuracy of their investigator's report.

But not afterward. At oral argument the plaintiffs' counsel, by telling us that "he wouldn't do much with [Singh] at trial," admitted that Singh, because of his recantation, would not be a witness for the plaintiffs. Either he had told the investigator the same thing he said in his deposition, which would be of no help to the plaintiffs and would expose the investigator as a liar, or he had made opposite assertions on the two occasions, in which event *he* was the liar, which wouldn't help the plaintiffs either. Singh is out of the case. The plaintiffs' abandonment of their sole confidential source— their only possible source of access to a Boeing database alleged to contain emails showing that the engineers who had conducted the wing tests had realized immediately that the test results compelled cancellation of the First Flight and had informed McNerney and Carson of this—was fatal.

But the plaintiffs also have a procedural challenge to the dismissal of the second amended complaint. Ordinarily when evidence is submitted in support of a Rule 12(b)(6) motion, the motion is converted to a motion for summary judgment, Fed. R. Civ. P. 12(d); and Rule 56 prescribes procedures for such motions that were not followed in this case. But the argument founders on the plaintiffs' abandonment of Singh, and with him their claim of access to internal Boeing emails that might establish fraud. The only thing that persuaded the district judge not to dismiss the second amended complaint, having dismissed the first one for failure to state a claim under the rules applicable to securities fraud litigation, was the allegation that the plaintiffs had

a confidential source who was a high-ranking Boeing engineer with access not only to the results of the 787-8 wing-stress tests but also to internal emails between the engineers who conducted the tests and high-ranking officials of Boeing that would have contradicted the officials' public statements about the 787-8's development schedule.

Without evidence from the confidential source, then, the first dismissal stood, its validity unassailable. All that changed was that the second dismissal was with prejudice, since it was obvious (and not contested) that the plaintiffs had nothing to offer by way of a third complaint. They do not ask for leave to conduct further discovery in hopes of rehabilitating their confidential source.

It remains to consider the cross-appeal, in which the defendants complain about the judge's failure to consider the imposition of Rule 11 sanctions on the plaintiffs' lawyers. The plaintiffs argue that we have no appellate jurisdiction because while the defendants, in moving to dismiss the second amended complaint, told the judge they were going to ask for the imposition of sanctions, they never filed a motion for sanctions. So there is no order denying sanctions and therefore, the plaintiffs argue, no order to take an appeal from. But this argument founders on an unusual provision of the Private Securities Litigation Reform Act: "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party . . . with each requirement" of Rule 11, and if a violation is found "the court shall impose sanctions" on a

party or lawyer who has violated the rule. 15 U.S.C. §§ 78u-4(c)(1), (2). There is no requirement that the defendant have asked for the imposition of sanctions.

The defendants made clear in moving for dismissal of the second amended complaint their belief that the plaintiffs' lawyers had violated Rule 11, with which the judge's harsh criticism of the plaintiffs when she dismissed the second amended complaint indicated agreement. But in any event it would have been her duty, "upon final adjudication of the action"—which occurred when she dismissed the second amended complaint on reconsideration and entered final judgment—to determine whether to impose sanctions even if the defendants had not invited her attention to the issue. *Morris v. Wachovia Securities, Inc.*, 448 F.3d 268, 283-84 (4th Cir. 2006); see 15 U.S.C. § 78u-4(c)(1); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009). Her failure to do so made the final judgment—an appealable order, of course—vulnerable to challenge by the defendants.

The plaintiffs' lawyers had made confident assurances in their complaints about a confidential source—their only barrier to dismissal of their suit—even though none of the lawyers had spoken to the source and their investigator had acknowledged that she couldn't verify what (according to her) he had told her. She had qualms: the names the source had given her of persons to whom he reported in the Boeing chain of command were inconsistent with what she was able to learn about the chain. This should have been a red flag to the plaintiffs'

lawyers. Their failure to inquire further puts one in mind of ostrich tactics—of failing to inquire for fear that the inquiry might reveal stronger evidence of *their* scienter regarding the authenticity of the confidential source than the flimsy evidence of scienter they were able to marshal against Boeing. Representations in a filing in a federal district court that are not grounded in an "inquiry reasonable under the circumstances" or that are unlikely to "have evidentiary support after a reasonable opportunity for further investigation or discovery" violate Rules 11(b) and 11(b)(3).

The plaintiffs' law firm—Robbins Geller Rudman & Dowd LLP—was criticized for misleading allegations, concerning confidential sources, made to stave off dismissal of a securities-fraud case much like this one, in *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2012 WL 4096146 at *16-18 (N.D. Ga. Aug. 28, 2012). The firm is described in two other reported cases as having engaged in similar misconduct: *Campo v. Sears Holdings Corp.*, 371 Fed. Appx. 212, 216-17 (2d Cir. 2010); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037-39 (N.D. Cal. 2012). Recidivism is relevant in assessing sanctions. *Reed v. Great Lakes Cos.*, 330 F.3d 931, 936 (7th Cir. 2003).

The only question is whether we should decide whether to impose Rule 11 sanctions or remand to the district court to decide. A court of appeals can take the former course in a clear case. *Citibank Global Markets, Inc. v. Rodriguez Santana*, 573 F.3d 17, 31-32 (1st Cir. 2009); *Dellastatious v. Williams*, 242 F.3d 191, 197 n. 5 (4th Cir.

2001). But remand generally is the preferable course. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 637-39 and n. 16 (11th Cir. 2010); *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004); *Gurary v. Winehouse,* 190 F.3d 37, 47 (2d Cir. 1999). The district court is in a better position than the court of appeals to calculate the dollar amount of the sanctions. It also may have additional insights into the accused lawyers' conduct, by virtue of having spent more time on the litigation than the appellate court, though that is unlikely to be a factor in this case given the substitution of district judges that we noted at the beginning of our opinion.

The judgment dismissing the suit is affirmed insofar as it dismisses the suit with prejudice, but is vacated and the case remanded for consideration, pursuant to 15 U.S.C. §§ 78u-4(c)(1), (2), of whether to impose Rule 11 sanctions on the plaintiffs' lawyers and if so in what amount.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH DIRECTIONS.